ELI PECK *et al.*

*v.*

JAMES HERRINGTON.

*Filed at Ottawa January 23, 1884.*

</div>

1. SURFACE WATERS—DRAINAGE—*dominant and servient heritage— relative rights in respect thereto.* In this State the same rule is applied to surface water flowing in a regular channel as is applied to a water-course. The owner of the dominant heritage, or higher tract of land, has the right to have the surface water falling or coming naturally upon his premises, pass off the same through the natural drains upon and over the lower or servient lands; and the owner of the dominant heritage may, by ditches or drains, drain his own land into the natural and usual channel, even if the quantity of water thrown upon the servient heritage is thereby increased.

2. Where two tracts of land adjoining each other are so situated that the water falling or collected by melting snow and the like upon one, naturally descends upon the other, it must be suffered by the owner of the lower one to be discharged upon his land, if desired by the owner of the upper field.

3. The owner of the upper field in such a case has a natural easement, as it is called, to have the water that falls upon his own land, flow off the same upon the field below, which is charged with a corresponding servitude in the nature of dominant and servient tenements.

4. The owner of the upper field can not construct drains or ditches so as to create new channels for water in the lower field, but he may make such drains for agricultural purposes on his own land as may be required by good husbandry, although by so doing the flow of water may be increased, in a regular, well-defined channel, which carries the water from the upper to the lower field.

5. The owner of land upon which there is a pond, in which is collected the surface water, only, from rains and melting snow, when good husbandry so requires may drain the same by an artificial drain constructed upon his own land, whereby its water is thrown into the same outlet or natural drain it was accustomed to take before, when the pond was full, notwithstanding the flow of the water over a servient tract of land may thereby be increased.

APPEAL from the Appellate Court for the Second District;— heard in that court on appeal from the Circuit Court of Kane county; the Hon. C. W. UPTON, Judge, presiding.

This was a bill in chancery, filed in the Kane circuit court by James Herrington, against Eli Peck and Sackett Booth, seeking a perpetual injunction restraining the defendants from draining certain sloughs, or small ponds, situate nearly a mile from complainant's lands, into the natural watercourse or channel on their own lands, whereby it is claimed it will flow over his lands and into Mill creek. On a hearing, the circuit court dismissed the bill for want of equity, and dissolved the injunction. From this decree the complainant brought the case, by appeal, to the Appellate Court for the Second District, where the decree of the circuit court was reversed, and the cause remanded, with directions to the latter court to render a decree in accordance with the opinion of the Appellate Court. From this order the original defendants appealed to this court. The facts are sufficiently stated in the opinion.

The following is the diagram or map referred to in the opinion:

Statement of the case.

Mr. Charles Wheaton, Messrs. Nichols & Clapsaddle, and Mr. F. Green Garfield, for the appellants:

As to the right of a party to improve his land by throwing increased water upon lower land through the natural channel, see *Martin* v. *Riddle*, 26 Pa. St. 415; *Kauffman* v. *Griesemer*, 26 id. 407; *Goodale* v. *Tuttle*, 29 N. Y. 459; *Miller* v. *Laubach*, 47 Pa. St. 154; *Gormley* v. *Sanford*, 52 Ill. 158; Washburn on Easements, 292, 427; *Gannon* v. *Hargadon*, 10 Allen, 110; *Broadbent* v. *Ramsbotham*, 11 Exch. 602; *Martin* v. *Jett*, 12 La. 504; *Rawstron* v. *Taylor*, 11 Exch. 369; *Delahoussage* v. *Judice*, 11 La. Ann. 587; *Herbert* v. *Hudson*, 13 La. 54; *Dallmen* v. *Davis*, 14 id. 161; Angell on Water-courses, 122; *Frazier* v. *Brown*, 12 Ohio St. 294; *Buffon* v. *Haines*, 5 R. I. 243; *Hicks* v. *Silliman et al.* 93 Ill. 256; *Mellor* v. *Pilgrim*, 7 Bradw. 306; *Carl* v. *De Hart*, 12 N. J. (1 Beas. Ch.) 280; 81 N. Y. 86.

Mr. B. C. Cook, for the appellee:

While the owner of the superior heritage has a natural easement to have the water which falls upon his lands flow off the same upon the lands of an adjoining heritage below, yet he can not, by a system of drainage, collect the water and precipitate it upon the land below. *Smith* v. *Kenrich*, 7 C. B. 515; *Dickenson* v. *City of Worcester*, 7 Allen, 19; *Butler* v. *Peck*, 16 Ohio St. 334; *Miller* v. *Laubach*, 47 Pa. 154; *Frazier et ux.* v. *Wayne*, 29 Wis. 511; *Hoyt et al.* v. *City of Hudson*, 27 id. 656; *Hicks* v. *Silliman*, 93 Ill. 255; *Livingston* v. *McDonald*, 21 Iowa, 160; *Taylor* v. *Fickas*, 69 Ind. 201; *Schlecker* v. *Phillippi*, 67 id. 201; *Waffle* v. *New York Central R. R. Co.* 58 Barb. 413; Cooley on Torts, 577; Washburn on Easements, secs. 209, 210; Wood on Nuisance, 404.

Per Curiam: Much evidence was introduced on the hearing of this cause, which has been carefully considered, and while there is some conflict in the testimony, yet upon the

main points involved there is no more conflict than may be
expected where so many witnesses have been examined. The
Appellate Court, as appears from the record, found the facts
differently from the circuit court, and from the facts so found
arrived at a different conclusion from the one reached by the
circuit court, and hence reversed the decree which had been
rendered in the circuit court.

Without undertaking to determine whether all the facts
found by the Appellate Court are fully justified by the evi-
dence, we think it is clear, from the testimony heard on the
trial, that the land of appellant Peck lies much higher than
the land of appellee, Herrington. From "A," the pond on
the land of Peck, along the dotted line on the map in evidence,
to "I," where the water is discharged on Herrington's land,
there is a gradual descent, the pond "A" being 29.72 feet
higher than the point "I." From "I," across Herrington's
land, to Mill creek, at point "L," there is a fall of 10.17 feet,
which makes a fall of 39.89 feet from the pond on appellants'
land to "L," the surface of the water of Mill creek. It also
appears, from the evidence, that during the wet portion of
the season, for many years, there has been a natural flow of
surface water along or near the dotted line from "A" to "I."
Upon this point Mr. Hawkins, who was familiar with the
location of the property, testified: "The natural outlet of
pond 'A,' as it existed in a state of nature, was very nearly
where the dotted line is, as represented on the Pease map.
I am familiar with the lay of the country between pond 'A'
and the point 'I,' as shown by the dotted line on this map,
and the ditch or excavation, and know which way the water
would flow from pond 'A,' in a state of nature. I think the
dotted line is the natural outlet of the water as it was when I
first became acquainted with the land. There are places
where the courses have been obstructed by plowing, etc.
There is a natural outlet of this slough 'A' along where this
dotted line is on this map, that was not straight, to carry the

water in a straight line through Mr. Peck's line; some little obstruction would be encountered, through which knoll-ditches would be cut, but not changing the natural course of the water materially. I do not think the surface drainage from pond 'A,' as shown on this map, has been changed, as to its point of discharge at the point 'I,' by the means of these ditches. The water always run there. There has been no change of the surface drainage between pond 'A' and point 'I.' There has been a ditch dug between slough 'A' and a little, say some one hundred feet, from the slough or pond, continuing on to the next slough near Mr. Booth's. I should think that ditch is in the natural outlet, as near as could be dug. Then as the ditch is continued from the east sag on towards the road running north and south, it varies a little from the natural outlet. This ditch from the east sag is about straight, while the natural channel runs a little crooked. It varies but a few feet, at the farthest, from the natural outlet, while when it strikes the road it comes to the natural outlet again. I can't explain every place where the water would have run thirty-five years ago. As I said before, there was made, years ago, a channel with a plow, across Mr. Peck's field, in the lowest place most of the way, so as to convey it (the water) into one channel across this field. There is a point near the quarter section, on section 7, on land formerly owned by Mr. Bullard. I should think the course of the water had been changed a little there, the natural channel being a few rods north of the ditch, as indicated by the dotted line, but making around into the same natural water-course where the water runs now, and not changing the natural outlet. West of this north and south road, and on section 7, there is a natural depression where this water-course is,—there is more than one hundred acres, there may be two hundred of it,— which naturally descends towards the ponds indicated by the dotted line on the map. These ditches, made with a plow along the course of this dotted line between points 'A' and 'I,'

have not in any manner changed the outlet or discharge of the water at point 'I.' I do not see how these ditches between points 'C' and 'I' have had, or could in any manner affect or increase the quantity of water discharged at point 'I.'" The testimony of this witness was corroborated by that of others. It also appears, from the evidence, that at point "D," marked on the map, the land was originally quite flat, and after long-continued rains the water would stand upon it for a time. In 1854 the land now owned by Herrington was owned by one John Bullard, who also owned the land extending from "D" to "E," and for a distance of fifteen rods west of "E." At the date last named, by the consent and with the authority of Bullard, the then owner, the natural channel of the surface water from "D" to "E," and fifteen rods west, was deepened, and since that time no water has been known to stand at the point "D." It also appears, from the evidence, that the tile-drain which Peck proposed to put in when the injunction was served, extended from "A" to "C," where the water would be discharged in the natural channel where the surface water had run for many years. The point "C," which appellant designed as the outlet for the tile-drain, was on his own land, and a distance of more than a half-mile from Herrington's land. Under such circumstances, did appellant Peck have the right to tile-drain the ponds, and turn the water therein in the channel which had for a number of years carried off the surface water?

It is not denied, as we understand the argument, that the owner of a dominant heritage may, by ditches or drains, drain his own land into the natural and usual channel or water-course, even if the quantity of water thrown upon the servient heritage is increased. But it is said there is no natural water-course here into which the ponds could be drained, and in support of this position we have been referred to *Hoyt* v. *City of Hudson*, 27 Wis. 656, and other like cases in that State, where it was held that a water-course or natural

channel is a stream usually flowing in a particular direction, in a definite channel, and discharging into some other stream or body of water, and the term does not include surface water conveyed from a higher to a lower level, for limited periods. It is a sufficient answer to the position taken that the rule established in Wisconsin has never been adopted in this State, but on the other hand, the same rule has been applied to surface water flowing in a regular channel as is applied to a water-course. The two following cases will be found to be in point on the question: *Gillham* v. *Madison County R. R. Co.* 49 Ill. 484; *Gormley* v. *Sanford*, 52 id. 158. In the last case cited, it is said: "It is admitted that the water which flowed from Sanford's to Gormley's land, the obstruction of which is the basis of the action, is wholly surface water, * * * and much of the argument has been addressed to the question whether the same law in regard to drainage which applies to well defined water-courses is applicable to cases of this character." This question has already been decided in *Gillham* v. *Madison County R. R. Co.* 49 Ill. 484. In the opinion filed in that case we said: "Although there was a conflict of authorities among the courts of this country, yet the rule forbidding the owner of the servient heritage to obstruct the natural flow of surface waters, was not only the clear and well settled rule of the civil law, but had been generally adopted in the common law courts both of this country and of England. * * * The cases asserting a different rule for surface waters and running streams, furnish no satisfactory reason for the distinction."

We now come to the main question in the case. Had Peck the right to drain the water from the ponds and discharge the same on his own land in the channel which carried the surface water from his land to that owned by Herrington? It may be regarded as a well settled principle of law, that where two farms adjoin, and one lies lower than the other, the lower farm will be subject to the natural flow of water

from the one which lies in a more elevated position,—or as declared by Washburn on Easements and Servitudes, page 353: "It may be stated as a general principle, that by the civil law, where the situation of two adjoining fields is such that the water falling, or collected by melting snow and the like, upon one, naturally descends upon the other, it must be suffered by the lower one to be discharged upon his land, if desired by the owner of the upper field." The owner of the upper field, in such a case, has a natural easement, as it is called, to have the water that falls upon his own land flow off the same upon the field below, which is charged with a corresponding servitude in the nature of dominant and servient tenements. (Ibid. 355.) It may also be regarded as a well settled rule that the owner of the upper field can not construct drains or ditches so as to create new channels for water in the lower field, but he may make such drains, for agricultural purposes, on his own land, as may be required by good husbandry, although by so doing the flow of water may be increased in a regular, well-defined channel, which carries the water from the upper to the lower field.

But it is said that the owner of the dominant heritage can not drain natural ponds of water from his own land upon the land of his neighbor below him. The ponds which Peck proposed to drain were merely the collection of surface water from rain and melting snow, which fell upon the land. Suppose Peck, instead of tile-draining the ponds, had filled them up with dirt. This would have caused the water which before accumulated in the ponds, to flow down the channel indicated on the map by the dotted line, upon the land of Herrington. It will not be pretended that in such a case he would have violated any rule of law. As was said in *Goodale* v. *Tuttle*, 29 N. Y. 459: In respect to the drainage of surface water, there is no principle which will prevent the owner of land from filling up the wet and marshy places to his own advantage because his neighbor's land is so situated as to be

incommoded by it. If it be true that the water which would naturally accumulate in these ponds could be cast upon Herrington's land by filling them up, upon what principle can the owner of the dominant heritage be denied the right to do the same thing in another way? If the water which would naturally accumulate in those ponds can be turned upon Herrington's land by filling them up, we perceive no reason why the water may not be drawn off by tile-draining, if good husbandry required it. These were small ponds, the largest one containing only three acres. Good husbandry did not, in our judgment, require Peck to keep this collection of water standing on his farm, and gradually seeping into his other land, and thus making it unfit for cultivation; but on the other hand, we are of opinion that he had the right to tile-drain the ponds, and carry off the water in the natural channel leading from "A" to "I," although the flow of water would thereby be increased. This view of the subject we believe to be reasonable, and well sustained by authority. *Martin* v. *Riddle,* 26 Pa. St. 415; *Kauffman* v. *Griesemer,* id. 407; *Miller* v. *Laubach,* 47 id. 154; *Broadbent* v. *Ramsbotham,* 11 Exch. 602; *Rawstron* v. *Taylor,* id. 396; *Frazier* v. *Brown,* 12 Ohio St. 294.

It may be true that the owner of a tract of land would have no right to drain a lake or large body of water upon the land of an adjoining owner, and thus destroy it; but such is not this case. These small ponds rendered much of the land of Peck unfit for cultivation, and good husbandry required that they should be drained, and so long as the water was discharged in the regular channel leading from the land of Peck to that of Herrington, he has no legal ground of complaint. The natural flow of the surface water was not changed by the drainage. It may have been increased, but such increase of water was a burden which the location of the two tracts of land demanded should be borne by the owner of the lower tract of land. As was said in *Kauffman* v. *Griesemer,*

*supra:*   "Because water is descendible by nature, the owner of a dominant or superior heritage has an easement in the servient or inferior tenement for the discharge of all waters which by nature rise in, or flow or fall upon, the superior."

The judgment of the Appellate Court will be reversed, and the cause remanded.

*Judgment reversed.*

Mr. JUSTICE DICKEY:   I can not concur in this decision.