## The Fenton & Thompson Railroad Company, et al., v. John F. Adams, et al.

### Gen. No. 4,534.

1. DRAINAGE—*right of owner of land to construct.*  The owner of
land has the right to improve the fertility of his land by constructing
thereon a ditch which does not change the course of the natural flow of
the water over the land of others but brings it to their lands by a
shorter route and thereby in increased quantities, and this notwith-
standing the result is to increase the expense of maintaining their
lands for the uses to which they have been put.

Bill for injunction.    Appeal from the Circuit Court of Whiteside
County; the Hon. FRANK D. RAMSAY, Judge, presiding.    Heard in this
court at the April term, 1905.    Affirmed.    Opinion filed August 1,
1905.

A. A. WOLFERSPERGER and L. T. HOCKING, for appel-
lants.

C. C. McMAHON, for appellees.

MR. JUSTICE FARMER delivered the opinion of the court.

The Fenton & Thompson Railroad runs diagonally
through sections 13, 14 and 24 in Fulton township, White-
side county, Illinois.    Near the east line of section 14 and
something more than one-fourth of a mile north of the east
and west half-section line, the railroad crosses Otter Creek,

which is a running stream of water. The creek at this place, and for nearly a mile east of the point where it is crossed by the railroad, runs west on an almost straight line. It then bends to the northeast. The railroad crosses the creek on a bridge 280 feet long, which affords a passageway for the water under the track. After crossing Otter Creek, the right of way of the railroad for some distance is on high land until near where it enters appellee Akker's land in the southwest part of the northeast quarter of section 24, where it crosses a valley several rods wide, extending north and south and declining to the south. On the east this valley is bounded by a range of bluffs or high land. The railroad company proposed to construct its tracks across this valley on an embankment twenty feet high, and put a four-foot cast-iron pipe through the embankment under the railroad, several rods southeast of the place where the water naturally flowed south for the passage of the water flowing through this valley. Appellant Holleran owns the north half of the southeast quarter and the northeast quarter of the southwest quarter of section 24, and appellant Wolters owns lands in section 26 southwest of the Holleran lands. This land, except a portion of the first above described tract belonging to Holleran, lies on the southwesterly side of the railroad. Appellee Akker owns the northeast quarter of section 24 and the south half of the southeast quarter of section 13, all of which lies in the valley mentioned, north of the right of way of the railroad. Appellee Adams owns the west half of the southwest quarter of the northwest quarter of section 18 in Ustick township, which lies immediately east of section 13 in Fulton township. A gulch or ravine enters the valley from the east a short distance east of the township line between Fulton and Ustick townships, which is the east boundary of section 24, and something like a fourth of a mile north of the east and west half-section line of section 24. This ravine extends back into the country east several miles and affords drainage in wet weather for a considerable scope of territory. In dry weather it is dry, but in times of heavy rains

a large volume of water is brought down into the valley through it, and with the water is also brought down quantities of sand, logs, stumps, trees, brush and other debris. From the mouth of the gulch, the water runs in a northwesterly direction under a bridge called in this record Bridge No. 1, on an east and west highway, and after passing through under the bridge, it continues to run northwesterly until the channel ceases, where it spreads out over a considerable body of low land belonging to appellees and a Mr. Kustes, and then after this depression is filled, it passes west and then south through Bridge No. 2 on the same east and west highway, a little more than eighty rods west of Bridge No. 1, and thence on south through the valley and what is known as the Worthington ditch, crossing the right of way of the railroad near the southwest corner of the northeast quarter of section 24, and continuing on south across the lands of Holleran and Wolters into the Cat Tail Slough and thence into the Mississippi River. Appellees proposed to construct a ditch wholly on their own land, commencing at the mouth of the gulch and running from thence substantially directly west and emptying into the Worthington Ditch on the southwest quarter of the northeast quarter of section 24, about twenty-three rods north of the right of way of the railroad. Appellants filed their bill alleging that appellees were about to divert water in large quantities from its natural course by the proposed ditch and cause it to flow upon and injure their land, and prayed that they be restrained from constructing said ditch. Appellees answered the bill and filed a cross-bill, in which they alleged the natural flow of the water that came into this valley through the gulch was southward through the channel the proposed ditch would empty into, and further alleged that the railroad company was constructing a large embankment twenty feet high to lay their tracks on, and by said embankment were closing up the natural waterway across the line of the railroad, and proposed to leave a passageway for all the water that came down the valley through a cast iron pipe forty-eight inches

in diameter, fifty to seventy rods southeast of where the natural waterway crossed the line of the railroad. The cross-bill prayed that the railroad company be enjoined from closing this waterway, and prayed that they be required to provide at that place a bridge of not less than fifty feet in length for the passage of the water through this valley from the north to the south side of the railroad. Upon a hearing, the original bill was dismissed for want of equity and a decree entered on the cross-bill perpetually enjoining the railroad company from filling the water course from north to south at the southwest corner of section 24, by the construction of their grade or in any manner obstructing the free flowage of water through it, and it was further decreed that a passage for said water at this place should be left by the railroad company of at least forty feet in width and fifteen feet high, measuring from the natural surface of the ground, and from that decree complainants in the original bill and defendants to cross-bill prosecute this appeal.

The proof abundantly establishes that after the basin or depression in the lands of appellees and Kustes is filled, the water naturally flows to the west and south under Bridge No. 2 on the east and west highway, and thence south across the right of way of the railroad and over the land of appellants Holleran and Wolters. It is not denied by appellants that this is the natural outlet and course of the waters brought into the valley from the high lands on the east in times of heavy rains and freshets. The only conflict is as to the quantity of water coming down this outlet and course. The proof shows the soil of the low lands where the water spreads out north of the highway is of a sandy nature, and appellants contend that except in times of extraordinary rains, the water seeps into the soil or evaporates so that only a small quantity flows south through the valley to the railroad. One of the engineers of appellant testified that not more than one-fifth or one-sixth of the waters brought in the valley from the gulch ever passed south of Bridge No. 2. The proof shows that other waters

are brought to these lands in the valley by other ravines coming into it from the bluffs, and also that Otter Creek at times overflows and the overflow from that stream flows south into the same low lands and through the outlet mentioned, under Bridge No. 2, and down the valley across the right of way of the railroad. If the proposed ditch is constructed, all the water brought into the valley from the gulch mentioned will be carried west and discharged into the Worthington Ditch, about 120 rods south of Bridge No. 2, and none of it will reach the land north of the highway where it is now discharged. It is not contended by appellants that any right exists to obstruct the overflow from the depression in the lands on the north side of the highway, but they insist that all the water discharged into this basin, except what naturally overflows from it, should be retained there until it evaporates or seeps into the soil. The fall from these low lands south is slight and the current slow, so that it is undoubtedly true that a good deal of the water discharged on appellees' lands from the gulch never does pass south of the public highway, and the construction of the ditch proposed by appellees would bring upon appellants' lands an increased quantity of water. Appellees contend that the water from the proposed ditch will be discharged into the natural course the water finally flows in from their lands when carried north and discharged thereon as conditions now exist, and that they have a right by constructing ditches wholly upon their own lands to shorten the course of the flow, provided they deposit the water in the same natural course it previously flowed in. They claim this is authorized by the law as declared in Peck v. Herrington, 109 Ill. 611, and other subsequent cases.

That south under Bridge No. 2 and through the valley and Worthington ditch across the right of way of the railroad is the only outlet for the waters collecting on appellees' lands north of the highway, is clearly shown by the testimony, and that a very considerable volume of water flows down this outlet is shown by the weight of the evidence. The highway west of Bridge No. 2 was graded

about one foot above the natural surface of the ground, and a large number of witnesses testified they had seen the water running south over the top of this grade in streams from several feet to several rods wide. One witness testified he had seen the water flowing over the road west of Bridge No. 2 hub deep, eight to ten rods wide; another, that he had seen it sixteen to twenty inches deep flowing over the road to the south; another that he had seen the water flowing over the road six to eight inches deep and eight to ten rods wide. Other witnesses also testified that large quantities of the water that came upon appellees' lands north of the highway flowed south through its natural outlet across the highway at Bridge No. 2, and thence south in the Worthington Ditch or in the valley along its line until it finally reached the Cat Tail Slough. When the water came down in very large quantities the Worthington Ditch was not sufficient to carry it all and it spread and ran down over the surface of the valley. We regard the case of Peck v. Herrington, *supra*, as supporting appellees' right to construct the proposed ditch. That case held that the landowner might construct ditches and drains for agricultural purposes on his own land and increase the flow of water in its regular channel from the upper to the lower land. In that case it was held Peck had the right to drain certain ponds on his land along the natural course of the flow of surface water, the point of discharge being on his own land and in the line of the natural channel or flow of the water. The water so drained from these ponds finally passed over the lands of Herrington in larger quantities than they had done before. The Supreme Court held Peck had the right, if he so desired, to fill up these ponds so that they would not hold water, and that he also had the right to drain them in the same course the water would have flowed if he had filled them up, and say, " Good husbandry did not, in our judgment, require Peck to keep this collection of water standing on his farm, and gradually seeping into his other land, and thus making it unfit for cultivation; but on the other hand we are of opinion that he had

the right to tile-drain the ponds, and carry off the water in
the natural channel leading from ' A ' to ' I,' although the
flow of water would thereby be increased." There were
no ponds on the lands of appellees, but the water from the
bluffs was discharged in a depression slightly lower than
the surface of the land immediately south so that this de-
pression would have to fill before water would flow over
the rim to the south. If this depression had been filled up
and the surface raised so that there would have been no
basin, the water coming on the land there would have
immediately flowed south, and it was held in Peck v. Her-
rington, *supra*, that the owner might either fill up the
basin or drain it in its natural course. It was there said
that "So long as the water was discharged in the regular
channel leading from the land of Peck to that of Herring-
ton, he (Herrington) has no legal ground of complaint.
The natural flow of the surface water was not changed by
the drainage. It may have been increased but such increase
of water was a burden which the location of the two tracts
of land demanded should be borne by the owner of the
lower tract of land." The proposed ditch is wholly upon
the land of appellee Akker, and while it will change the
course of the water from the circuitous north, west and
south directions it now flows in to reach appellants'
lands, to an almost straight line west to the same water-
way leading south, it does not change the natural flow
of the water from appellees' lands. In Lambert v. Alcorn,
144 Ill. 313, where similar questions were involved, the
Peck-Herrington case was approved and followed, and it
was there said that clause 4 of the act to provide for
drainage for agricultural and sanitary purposes, and to re-
peal certain acts therein named, in force July 1, 1885, em-
bodies substantially in statutory form the rule established
in the Peck-Herrington case. That act is as follows :
" Owners of land may drain the same in the general course
of natural drainage, by constructing open or covered drains
discharging the same into any natural water course or into
any natural depression, whereby the water will be carried

Fenton & Thompson R. R. Co. v. Adams.

into some natural water course, or into some drain on the public highway with the consent of the commissioners thereto; and when such drainage is wholly upon the owner's land, he shall not be liable in damages therefor to any person or persons or corporation." Peck v. Herrington was followed in an action at law in Daum v. Cooper, 103 Ill. App. 4, and the judgment of the Appellate Court in that case was affirmed in 200 Ill. 538. It is true the Supreme Court in its opinion did not discuss the merits of the case, but the opinion says that court had sufficiently examined the question involved to become satisfied that there was no reversible error in the case, and the judgment was affirmed. In a chancery suit between the same parties, 208 Ill. 391, where similar questions to those in this case were involved, the Supreme Court held that the landowner might change a natural water course within the limits of his own land, provided he restored it to the original channel before it reached the land of others, if in doing so he did not cause to flow upon the lands of others, waters which would not in the course of nature flow there. Those cases appear to us to sustain the decree of the court in dismissing the original bill of complainants.

In Anderson v. Henderson, 124 Ill. 164, one of the cases relied on by appellants, this language is used: "While the owner of lower lands shall receive all water that naturally flows from the next higher lands, the owner of the higher lands may not open or remove natural barriers and let onto such lower lands water that would not otherwise naturally flow in that direction." The same language in substance will be found in Graham v. Keene, 143 Ill. 425, and appellants argue that what appellees seek to do is just what the Supreme Court said in those cases could not be done. Between the mouth of the gulch where the proposed ditch begins and the place of its discharge and near the beginning of the ditch, the surface of the land is higher than it is further west, so that the water coming into the valley from the gulch is prevented from flowing directly from its mouth west, and is diverted to the north and northwest.

Appellants argue that under the authority of the two cases mentioned, appellees have no right to cut through this natural barrier. We do not understand the cases relied on by appellants to be in conflict with Peck v. Herrington and subsequent cases. If the water from the gulch continued to flow in a northerly or westerly direction over and from appellees' lands and did not flow south over the lands of appellants, then clearly appellees would have no right to change the course of the water by cutting through the natural barrier. In the Anderson case, Anderson was a life tenant and in possession of a farm of 160 acres immediately west of a farm owned by Henderson. The decree of the Circuit Court found, and the Supreme Court say, this was the pivotal point on which the case turned, that on Anderson's land, 596 feet west of the line between his lands and Henderson's and running north and south, there was a rise or divide, and that the natural outlet of the water that gathered west of this divide was south and west and not easterly, and that cutting a ditch through this divide diverted a considerable portion of the water west of it from its natural course and caused it to flow over lands of Henderson. It was with reference to the facts in that case that the language of the opinion relied on by appellants was used, and it clearly appears that the facts in that case were unlike the facts in this case. Graham v. Keene, *supra*, involved a similar state of facts, and in that case Peck v. Herrington was cited with approval. There is no conflict, therefore, between these cases and the Peck-Herrington case. In so far as Hicks v. Silliman, 93 Ill. 255, appears to hold that the owners of lands situated as appellees' lands are, have no right to let the water out of the low places by ditches or drains, but must retain it there until it evaporates or seeps into the ground, we must regard it as departed from in Peck v. Herrington and subsequent cases we have above cited. We have not overlooked appellants' argument that the debris which is now brought down the gulch and deposited on appellees' lands north of the highway will, by the proposed ditch, be carried and de-

posited upon the lands where the ditch empties and south thereof. On account of the slight fall from north of the highway down to appellants' lands, the current is so slow as to carry but little, if any, deposit with it. The length of the proposed ditch is but little over half a mile and has a fall of about seventeen feet so that the debris will be carried onto the land where it discharges, but as this is wholly upon the land of appellee Akker, the fact that some of it may find its way, and doubtless will, on appellants' lands, cannot operate to deprive appellees of the right to construct the ditch. The ditch does not change the course of the natural flow of the water over appellants' lands, but brings it to their lands by a shorter route, and, therefore, in increased quantities, but this we understand is authorized by the cases we have referred to. The appellant railroad company offered proof that discharging the waters so near their right of way from the proposed ditch would greatly damage it, and necessitate riprapping its right of way at a large cost and render keeping it in repair expensive. If appellees had the right to construct the ditch, that right existed before the railroad company acquired its right of way, and the inconvenience and expense of building and maintaining its right of way could not defeat their right.

Appellants offered proof to the effect that the forty-eight inch pipe under the railroad was sufficient to afford ample passage for all the water that comes from the north and runs across the right of way. It is admitted that the location of the pipe is not where the water naturally flows across the right of way, but the railroad company claims it proposes to lead the water from the natural course along its right of way down to the pipe. Notwithstanding the testimony of civil engineers and others that this pipe is sufficient to afford a passageway from the water as it now comes down there without retarding its flow, when we consider the large quantities of water numerous witnesses testify to having seen flowing that way, it seems incredible that this should be so. In addition to the waters dis_

charged upon appellees' lands from the gulch referred to, other waters by other water courses are brought into the same place and also the overflow from Otter Creek. The only outlet for all this water when the basin overflows is south across the railroad right of way. It would seem, when we consider that at times the bridge on the highway was so inadequate to accommodate the flow from the lands of appellees that it ran over the highway for a considerable depth and for a width of several rods, that a pipe forty-eight inches in diameter, less than half a mile south of the bridge, would be wholly inadequate to let it through without seriously retarding the flow. But even if the pipe proposed under present conditions should be adequate, when the proposed ditch is completed, it would then clearly be insufficient, and we are of opinion the court properly enjoined the railroad company from filling up and obstructing the natural waterway and requiring it to leave an opening forty feet in length for the passage of the water. Believing the decree of the Circuit Court to be sustained by the law and the facts, it is affirmed.

*Affirmed.*