THE BROADWELL SPECIAL DRAINAGE DISTRICT No. 1, Appellee, *vs.* ARTHUR LAWRENCE, Appellant.

*Opinion filed December 17, 1907.*

1. DRAINAGE—*rule in Illinois as respects surface water.* In Illinois, so far as the relative rights of dominant and servient owners are concerned, there is no difference between water-courses, as the term is understood at common law, and surface water which flows in a regular channel at certain times, only.

2. SAME—*right of the dominant owner to collect surface water.* The owner of the dominant heritage may, by ditches and drains, collect the surface water falling or coming upon his lands and by such ditches and drains conduct the water into a natural channel, even though the quantity of water cast upon the servient heritage is thereby increased.

3. SAME—*when dominant owner loses right to drain over servient estate.* If the owner of the dominant estate voluntarily changes the course of the natural drainage so that the water thereafter ceases to flow over the servient estate, and such condition exists, without interruption, for over twenty years, mutual and reciprocal rights are acquired by prescription, exempting the dominant owner from restoring the water to its original channel and forever releasing the servient estate from the burden of the original easement.

4. SAME—*section 42 of Farm Drainage act construed.* Section 42 of the Farm Drainage act, which permits the owners of land outside a drainage district to connect with the drains of the district upon certain conditions, must be construed in connection with section 4 of such act, declaring the right of a dominant owner to drain his land over the servient estate, and when so construed does not permit such right of connection except by owners of land the natural drainage of which is in the direction of the drains where the proposed connection is to be made.

5. SAME—*when a land owner is not entitled to connect drains under section 42 of Farm Drainage act.* An owner of land lying outside of a drainage district is not entitled, under section 42 of the Farm Drainage act, to connect his drains with those of the district, where the effect of such connection would be to drain a large body of outlying land, the owners of which are not seeking admission into the district and whose lands cannot be assessed by the district for benefits.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Logan county; the Hon. T. M. HARRIS, Judge, presiding.

This is a bill brought by the Broadwell Drainage District No. 1 against Arthur Lawrence, in the circuit court of Logan county, to restrain Lawrence from connecting certain lands belonging to him with the tile drains of the district, and to compel him to discontinue a certain tile drain heretofore put in by said Lawrence connecting the south 80 acres of his lands with the drainage tile of the district. The circuit court, upon a hearing, granted the prayer of the bill, and its decree has been affirmed by the Appellate Court for the Third District.

The following map will aid in obtaining an understanding of the questions involved:

The territory embraced in the drainage district is shaded on the map. The dark line extending from "A" to "B" is the main drain of the district. This is a tile drain twelve inches in diameter at the outlet, "A," and eight inches at the initial point, "B." Appellant owns 240 acres of land, the south 80 acres of which is south of and just outside of the drainage district, designated by the letter "D" on the map. The other 160 acres lies immediately north of the south 80 and is within the drainage district. The said drainage district was organized in 1884, and the main tile, "A-B," is large enough to carry all the water coming into it from the lands embraced in the district as originally organized. In 1904 appellant put in a tile commencing about one thousand feet south of the north line of his south 80 and extended it north to a pond shown on the map; thence proceeded in an easterly curve for something over one-half mile; thence north, where he connected it with the district tile at the letters "L C," about the center of the south-east quarter of section 35. After appellant put in this line of tile from "D" to "L C," the diameter of which was the

same as the district tile with which it was connected, the carrying capacity of the district tile was overtaxed, and the result is that the head-on force of the water in appellant's tile causes the water to back up in the drainage tile toward point "M" and to overflow the lands in the district toward point "A." The increased quantity of water thus brought to the drainage district tile impedes the work of the tile and causes the water to remain a much longer time, after a freshet, on all the lands of the district than before appellant put in the connection. If appellant's tile is to be continued in its present condition it will be necessary for the drainage district to enlarge its drain so as to care for the increased quantity of water brought to it by appellant's tile.

Prior to 1874 there was a water-course, known in the record as "Lawrence slough," which flowed down from the south-east, passing about point "F," thence in a north-easterly course, and entered appellant's south 80-acre tract near the north-east corner. From this point this slough flowed north-easterly into a lake or pond called "Lawrence lake," which is shown on the map north-east of the letter "G." The Lawrence slough in its natural condition was quite an extensive swale and conveyed a large quantity of water, especially after heavy rains. This slough overflowed at times and its waters spread over the low lands near it, so that at times of excessive rainfall it was from one to two hundred yards wide. The effect of this slough flowing on to appellant's 80 acres just north of the south 80 was to make it very wet and marshy and much of it was unfit for cultivation. Some time prior to 1874,—probably the year before,—the appellant's father, who owned and controlled the lands which appellant now owns, constructed an artificial ditch from the east toward the west, which is shown on the map near the north line of the south 80-acre tract. The ditch is called the "Lawrence ditch." Its course on appellant's land is from east to west. At the east end it connects with the old channel of Lawrence slough, and the

purpose in making it was to divert the water of Lawrence slough and have it to pass through this ditch west, and thence north-west to an outlet. After this ditch was constructed the old channel of Lawrence slough was abandoned north of the connection with the ditch. The dirt removed from this ditch was banked up on the north side thereof, forming a barrier to prevent it overflowing to the north. The controverted questions of facts will be referred to further in the following opinion.

FRANK L. TOMLINSON, and BEACH, HODNETT & TRAPP, for appellant:

The owner of the dominant heritage or higher tract of land has the right to have the surface water falling or coming naturally upon his premises pass off the same upon or over the lower or servient land; and the owner of the dominant heritage may, by ditches or drains, drain his own land into the natural and usual channel, even if the quantity of water thrown upon the servient heritage is thereby increased. *Peck* v. *Herrington,* 109 Ill. 611; *Wilson* v. *Bondurant,* 142 id. 645; *Davis* v. *Highway Comrs.* 143 id. 9; *Lambert* v. *Alcorn,* 144 id. 327; *Dorman* v. *Droll,* 215 id. 262; *Pinkstaff* v. *Steffy,* 216 id. 406; *Railroad Co.* v. *Adams,* 77 N. E. Rep. 531.

Appellant had the right to drain his own land. *Dayton* v. *Drainage Comrs.* 128 Ill. 271; *People* v. *Drainage District,* 191 id. 623; *Helm* v. *Richmond,* 72 Ill. App. 516.

To constitute a water-course, within the meaning of the law, there need not be a defined bed or banks. *Ribordy* v. *Murray,* 177 Ill. 140.

Owners of land may drain the same in the general course of natural drainage by connecting open or covered drains, discharging the same into any natural water-course or into any natural depression, where the water will be carried into any natural water-course or into some drain on a public highway, with the consent of the commissioners thereto,

and when such drainage is wholly upon the owner's land he shall not be liable in damages to any person or persons or corporation.  Starr & Cur. Stat. sec. 108, p. 1537; *Lambert v. Alcorn,* 144 Ill. 327.

Water flowing over a ditch or percolating through banks is surface water and subject to the same rules as to drainage.  *Pinkstaff* v. *Steffy,* 216 Ill. 406; 24 Am. & Eng. Ency. of Law, 904; *Gray* v. *McWilliams,* 32 Pac. Rep. 976.

When appellant connected his drains with the drains of the drainage district he applied for admission into the district, and the right of appellee was to tax his land.  Farm Drainage act, sec. 42; *Drainage District* v. *People,* 138 Ill. 87; *People* v. *Drainage District,* 181 id. 177; *People* v. *Drainage District,* 155 id. 45.

A judgment in a proceeding to organize a drainage district, holding that certain lands are so situated that they would not be included, will not prevent their annexation or the owners thereof from subsequently connecting them with the ditches of the district.  *People* v. *Drainage District,* 189 Ill. 55.

It was the duty of the drainage commissioners to provide proper outlets to drain all the lands in the district, and such duty is enforcible by *mandamus.*  *Drainage District* v. *Adams,* 163 Ill. 428; *Kreiling* v. *Nortrup,* 215 id. 195.

Appellant had a natural easement appurtenant to his land outside of the drainage district to have the water falling or flowing thereon pass off the same in a natural waterway.  *Railway Co.* v. *People,* 212 Ill. 103.

HUMPHREY & ANDERSON, and BLINN & COVEY, for appellee:

A land owner cannot divert water from the course it flows in a state of nature and carry it upon the land of another where it would not flow in a state of nature.  *Anderson* v. *Henderson,* 124 Ill. 164; *Hicks* v. *Silliman,* 93 id. 255; *Dayton* v. *Drainage Comrs.* 128 id. 271.

If he does so divert water, an injunction to restrain him from so doing is the proper remedy. *Hicks* v. *Silliman,* 93 Ill. 255; *Dayton* v. *Drainage Comrs.* 128 id. 271.

While an owner of land may attach his ditches in land outside of the drainage district to the ditch of the district and thereby attach his land to the district in ordinary cases, under the statute, yet when by so doing he will carry into the district water falling on the lands of other people not connecting with the ditch of the district, such owner of land may be enjoined from thus connecting his ditch with the drainage district. *Dayton* v. *Drainage Comrs.* 128 Ill. 271.

Where a water-course has been changed by consent and allowed to stand for twenty years, an easement arises in favor of all interested and the same cannot be changed. *Ludlem* v. *Mayer,* 95 Mich. 586; *Earl* v. *DeHart,* 72 Am. Dec. 395; *Curtis* v. *Ayrault,* 47 N. Y. 73.

Under the act of 1899, when a ditch is changed by agreement the new ditch becomes a water-course, which can not be changed except by mutual agreement. Laws of 1899, p. 116; *Hunt* v. *Sain,* 181 Ill. 372; *Ribordy* v. *Murray,* 177 id. 134.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Before proceeding to a consideration of the questions of law involved, important matters of fact require attention. This being a chancery case, the facts are open for consideration here notwithstanding the affirmance of the decree below by the Appellate Court.

Much testimony was heard at the trial directed to three questions: (1) Did the drain which appellant put in, connecting what is called the south 80, take water from the Lawrence ditch and convey it to the drainage ditch? (2) Was the Lawrence ditch inside or outside of the boundary lines of the drainage district? (3) Did the water in a state of nature flow off the south 80 north toward the drainage district?

With respect to the first question, appellee insists upon an affirmative and appellant upon a negative answer thereto. If appellant is right in his position upon this matter of fact, appellee has no standing whatever in a court of equity to enjoin the maintenance of appellant's tile drain. We do not deem it at all necessary to go into a critical examination of the evidence in order to determine where the preponderance is upon this question. If the water from the Lawrence ditch did not flow through appellant's tile to the drainage district tile it is because it did not get into it. Appellant's tile was laid with the fall toward the district drain. It was put in for the express purpose of draining the south 80, and once the water from the Lawrence ditch was in the tile, no proof is needed to show that it would run by force of gravity with the incline of the tile and finally be discharged into the district tile at the point of connection. As a circumstance tending to prove that water from this ditch did not pass into the tile, appellant proved that his drain was laid with sewer tile at the point where it crossed under the ditch, and that the flanges, sides and top of the tile for the space of about six feet were covered with cement. A few witnesses expressed the opinion that water from the ditch did not pass into the tile in any considerable quantities. On the other hand, a large number of witnesses who had made a personal inspection of the premises testify to facts from which the conclusion is irresistible that a very large quantity of the water coming down the Lawrence ditch passed into this tile. We select the following excerpt from the testimony of E. W. Bates on this point. He says: "Was down there last Monday, September 11, 1905. At the east side, where we commenced, there was four or five inches of water in the ditch, four or five feet wide. As we went west the water was flowing slowly till we came to where the tile crossed the ditch. Then the water went down in the ground. There was a hole. I could hear it running in. There was no water in the ditch below the tile. That

was where the tile in this lawsuit crosses. It was as dry as any of the land." Evidence of the same general character was delivered by a large number of other witnesses, among them Read, Braucher, Shockey, Zeter and others. Aside from the direct testimony of those who saw the premises, a number of persons experienced in tile draining expressed the opinion that the water from the open ditch would naturally percolate through the sides of the ditch, follow openings made by the muskrats and crawfish and pass into the tile. We can reach no other conclusion under the evidence than that large quantities of water from the Lawrence ditch did, in fact, by means of appellant's tile drain, pass into the drainage district tile.

Upon the question whether the Lawrence ditch was in or out of the drainage district, without going into the details of the testimony our conclusion is that while it was evidently very near the line it was on the south 80-acre tract, and therefore outside the district. In reaching this conclusion we place much reliance on the testimony of Daniel S. Braucher, who is a surveyor and civil engineer of fifty years' experience. He made a survey of the lines and testifies that the ditch is on the south 80. No other person surveyed the lines. Witnesses who expressed opinions as to the location of the line between the two tracts based their testimony largely upon observations made by sighting through from certain trees which were assumed to be on the line. Aside from the inherent uncertainty of testimony based on such observations, it was shown in rebuttal that the trees supposed to be on the line were, in fact, some twenty feet off the line. Whatever the effect of it may be in the final disposition of the case, it must, we think, be accepted as a fact that the Lawrence ditch was outside the drainage district.

The third disputed question of the fact is whether in a state of nature the water which now comes down the Lawrence ditch flowed westerly in the general course of such

ditch or whether it flowed in a north-easterly direction to-
ward the basin known as the "Lawrence lake," on the north
80, and thence out of the lake toward the north in the gen-
eral direction of the place where the drainage district tile
is now located.   Appellant asserts that in a state of nature
the water from the south 80, or the greater portion thereof,
flowed toward the north or north-east, and he contends that
in tiling from the south 80 north he is only causing the
water to go in the direction of the natural drainage, which
he asserts he may lawfully do.   To understand the actual
situation as it is disclosed by the evidence it is necessary
to first look at conditions as they were prior to 1874 and
before the Lawrence ditch was made.   It is shown by a
survey made by John Zeter that the general course of the
surface water upon appellant's land was from the south-
east toward the north-west.   From the levels which Mr. Ze-
ter made, it appears that there is a natural fall of about
three feet from the north-east corner of appellant's south 80
to a point near the east side of the Lawrence lake.   The
evidence shows that water coming down this natural de-
pression flowed into the lake, and when the lake was full
the water escaped on the north side and flowed north in
the direction of the Lawrence residence.   There is an over-
whelming preponderance of the evidence that the middle or
north 80 of the Lawrence land was lower than the south 80.
There can be no serious contention, under the evidence, that
the water falling on much the larger part of the south 80,
and coming on to it through the swale from the lands south-
east of it, did not find its outlet toward the north and
north-east.   As a result of the large quantity of water thus
thrown upon the north 80 this tract was rendered marshy
and much of it unfit for cultivation, and besides, a large
quantity of water in certain seasons of the year stood on
this land near the Lawrence residence.   This was the con-
dition of these lands prior to 1874.   At that time it does
not appear that any tiling or ditching had been done on

either 80. About the year 1874 the owners of these tracts and the persons through whom appellant obtained his title constructed what is known in this record as the "Lawrence ditch." This ditch, as we have seen, was constructed on the south 80, near the north line of said tract, and it runs for a distance of one-half mile, or the entire length of the 80, in a westerly course, as shown on the plat. After passing off of appellant's land at the north-west corner of the south 80 the ditch runs north-west and finally empties into the outlet of the drainage district. When this ditch was constructed the dirt was thrown on the north side for the purpose of forming an embankment to prevent the water from overflowing to the north on the other 80, where it had formerly gone. The effect of constructing the Lawrence ditch was to divert the water from a natural water-course and cause it to pass through this artificial channel in another direction. A large number of witnesses testify that the water coming upon the south 80 flows to the north until it is intercepted by the Lawrence ditch and the embankment on the north side of the ditch, and thus is carried away by this ditch, but for the existence of which there is no doubt, under the evidence, that the water falling upon the south 80, as well as the water that comes from the south-east down the old swale, would flow on to appellant's north 80 and on down north toward the tile of the drainage district. In other words, it must be accepted as a settled fact, under the evidence in this record, that appellant's south 80 is the dominant estate and the north 80 and the other lands lying to the north thereof are the lower, and consequently the servient, estates.

Assuming the conclusions we have reached in regard to the disputed questions of fact to be supported by the weight of the evidence, we will proceed to express our views as to the legal rights of the parties under these facts.

Appellant relies on the common law rule established in this State, that the owner of the dominant heritage has a

right to have the surface water falling or coming upon his land pass off over or upon the land which is the lower or servient estate. The rule established by numerous decisions of this court is, that the owner of the dominant heritage may by ditches or drains collect the surface water falling upon his estate and by such ditches or drains conduct the water into a natural water channel, even if by so doing the quantity of water cast upon the servient heritage is thereby increased. This rule has been regarded as settled in this State ever since the decision in *Peck* v. *Herrington,* 109 Ill. 611, and the rule has often been applied since. *Lambert* v. *Alcorn,* 144 Ill. 313; *People* v. *Drainage District,* 155 id. 45; *Pinkstaff* v. *Steffy,* 216 id. 406; *Fenton and Thompson Railroad Co.* v. *Adams,* 221 id. 201; *Elser* v. *Village of Gross Point,* 223 id. 230.

Soon after the decision in *Peck* v. *Herrington* was announced the legislature passed the Farm Drainage act, section 4 of which is, in substance, the embodiment, in statutory form, of the law as declared by this court in that case. That section of the statute is as follows: "Owners of land may drain the same in the general course of natural drainage, by constructing open or covered drains, discharging the same into any natural water-course, or into any natural depression, whereby the water will be carried into some natural water-course, or into some drain on the public highway with the consent of the commissioners thereto; and when such drainage is wholly upon the owner's land he shall not be liable in damages therefor to any person or persons or corporation." See *Lambert* v. *Alcorn, supra.*

Conceding the facts to be that appellant's south 80 acres is the dominant heritage and that the lands lying to the north are the lower or servient estates, and that in a state of nature the drainage of the south 80 was north and northeast through the old channel, appellant contends that under the rule laid down by this court and declared by the legislature, as above pointed out, he has the right to connect

such dominant estate, by means of tile, with the drainage tile, and that in so doing he is only exercising the rights assured to him under the law. If appellant and his grantors had never abandoned the old water-course by the Lawrence ditch diversion we do not see what answer could be made to appellant's position. But we are of the opinion that when the owners of the dominant heritage, with the acquiescence of the servient owners, diverted the water from its natural course and established an artificial channel, through which the water has had an unvexed and uninterrupted flow for more than twenty years, mutual and reciprocal rights have been acquired by prescription exempting appellant from the duty of restoring the water to its original course and forever releasing the servient estate from the burden of the easement which once existed in favor of the dominant estate to drain its surface water upon the lower heritage. The above proposition is, we think, supported by authority. In Jones on Easements (sec. 808) it is said: "If a riparian proprietor changes the natural flow of the stream, other proprietors favorably affected by the change may acquire an easement in the new water-course by prescription, so that the flow of the water cannot be changed back to its original condition. Thus, if one diverts a stream into a new channel, in which it continues to run, with the acquiescence of the other proprietors affected by the change, for so long a time that new rights may be presumed to have accrued, the stream cannot be returned to its former channel to the injury of such other proprietors. If the artificial channel has been made to serve as a permanent channel and the flow of the water has continued for the period of prescription, owners of land through which it flows may acquire the right to use the artificial channel as if it were a natural stream." See, also, Gould on Waters, secs. 225, 340.

The case of *Mathewson* v. *Hoffman*, 77 Mich. 420, (6 L. R. A. 349,) is a decision which we regard as in point on this question. It is said by the court in that case

that "the exclusive enjoyment of water in a particular way for twenty years, without interruption, becomes an adverse enjoyment sufficient to raise a presumption of title against a right in any other person which might have been, but was not, asserted. This rule must be reciprocal, and one who has taken the water from the original channel and has continued to divert and enjoy it for a period beyond the statutes of limitations as to real actions, cannot afterwards be permitted to restore it to its original state when it will have the effect to destroy or materially injure those through or by which it formerly flowed." In. *Smith* v. *Youmans,* 96 Wis. 103, (37 L. R. A. 285,) the decision is based on the same principles. In *Belknap* v. *Trimble,* 3 Paige, 577, it was held that the rule must be reciprocal; that a proprietor of land at the head of a stream who has changed the natural flow of the waters and has continued such change for more than twenty years, cannot afterwards be permitted to restore it to its natural state when it will have the effect to destroy the mills of other proprietors which have been erected with reference to such change in the natural flow of the stream; and the same rule has been re-affirmed · in later New York cases. (See *Lampman* v. *Mills,* 21 N. Y. 505; *Roberts* v. *Roberts,* 55 id. 275.) It is also supported in Delaware by *Delany* v. *Boston,* 2 Harr. 489, and in Vermont in *Woodbury* v. *Short,* 17 Vt. 387; 44 Am. Dec. 344. In the Vermont case it was held where the owner of a stream diverts it to a new channel and continues such diversion so long that rights have been acquired with reference to the changed condition, such party cannot change the stream back to its original course; and this rule has been re-affirmed in the later case of *Ford* v. *Whitlock,* 27 Vt. 265. Washburn, in his work on Easements, (pp. 313-315,) states the general principle underlying all these cases, as follows: . "Where one who owns a water-course in which another is interested or by the use of which another is affected, does or suffers acts to be done affecting the rights

of other proprietors whereby a state of things is created which he cannot change without materially injuring another who has been led to act by what he himself had done or permitted, the courts often apply the doctrine of estoppel, and equity, and sometimes law, will interpose to prevent his causing such change to be made."

These cases all relate to the diversion of water in running streams, except the Wisconsin case, which concerned Lake Beulah; but we perceive no reason, on principle, why the same rule should not be applied to what are called surface water channels, especially in view of the rule established in this State that, so far as the relative rights of the dominant and servient owners are concerned, there is no difference between what are called running streams or water-courses, as the term is understood at common law, and surface water, which flows in a regular channel only at stated periods. *Gillham* v. *Madison County Railroad Co.* 49 Ill. 484; *Gormley* v. *Sanford,* 52 id. 158; *Peck* v. *Herrington, supra; Chicago, Peoria and St. Louis Railway Co.* v. *Reuter,* 223 Ill. 387.

Applying the principles above announced to the case at bar we have this situation: Appellant owns the dominant estate. Prior to 1874 there was a natural water-course carrying the water, or the greater portion thereof, down north on the lands now in the drainage district. At that time the relative rights of the parties were to have the water continue to flow in its natural course. Under the law of this State appellant might, under the natural conditions, have collected the water falling or coming upon his dominant estate in drains or ditches and discharged it in the natural outlet, even though it might have increased the quantity of water upon the lower lands. He would not have been liable for any resulting damages. The owners of the lower lands could have enjoined the diversion of the water-course if a case of irreparable damage could have been shown. In this situation as to the property and the recip-

rocal rights flowing therefrom, the owner of the dominant estate voluntarily diverted the water from the natural course and into an artificial ditch, thereby obtaining better drainage for both the dominant and servient estates. This condition has been maintained for more than thirty years. The lower lands, that were once a marsh, have been reclaimed and in the bed of the old channel corn is grown. Can appellant now claim that because the water once, in a state of nature, passed off to the north, he may now re-assert the right to have such water again flow there and the lands below again re-assume the burden of an easement long since lost by abandonment? To so hold would be contrary to sound reason, inequitable in the extreme and contrary to the established rules of law. If appellant has lost the right to re-open the natural channel and can no longer avail himself of the rights growing out of the natural situation of his land with respect to the flowage of the water to the north, he cannot accomplish the same thing, under the doctrine of *Peck* v. *Herrington* and the provision of section 4 of the Farm Drainage act, by putting in tile and collecting the water therein at another point in the open ditch and thus convey it to the lower heritage to the injury and damage of the lower estates. In other words, in our opinion appellant's position in this case is precisely the same that it would be if the Lawrence ditch were a natural water-course and the natural outlet for the water on the south 80. In this view it is clear that appellant has no right, either under the rule established by the decisions of this court or under section 4 of the Drainage law, to divert the water from the open ditch into the drainage tile.

Appellant contends that under section 42 of the Drainage law he has a right to connect his land with the drainage district tile, and that when such connection is made it is to be regarded as an application to be taken into the district. We cannot assent to this view. Section 42 of the Drainage law must be construed in connection with section 4, above

referred to.   Section 4 permits, as we have seen, the owner to drain his land in the course of natural drainage and to discharge the water into a natural water-course or into a natural depression, whereby it will be carried to a natural water-course or into some drain on a public highway, with the consent of the commissioners.   Section 42 permits the owners of land outside the district or in other districts to connect with the drains of a district on certain conditions as to assessments, etc.   In our opinion this section does not contemplate that this right shall be exercised except by the owners of land the natural drainage of which is in the direction of the drains with which the proposed connection is to be made.   It certainly was not contemplated that any owner of land, regardless of the topography of the country, should have the right to cut through natural barriers and connect lands with a drainage district which are in another watershed and in a state of nature have their drainage in an opposite direction.   Appellant's south 80-acre tract is not literally outside the basin of the drainage district, yet if, as we have sought to show, by the Lawrence ditch diversion he has lost the right to restore the old channel of the Lawrence slough, he cannot, under section 42, re-assert such right by connecting the waters of the slough by an artificial drain with the district.   In other words, it would seem that a fair and reasonable construction of section 42 is, that it permits the drainage of only such lands outside the district as in a state of nature drained in the general direction of such district drains, otherwise, under the construction contended for by appellant, any land owner or owners, regardless of the natural location and drainage of their lands, would have power to compel a drainage district to admit their lands into the district, even though by so doing the entire system of drainage installed and paid for by the district would have to be discarded as insufficient and useless.   Such cannot have been in contemplation when section 42 was enacted.

But, regardless of this view, there is another conclusive reason why appellant cannot maintain this connection with the Lawrence ditch. As already shown, the water flowing down the old Lawrence slough or swale, which has been diverted into the Lawrence ditch, is collected from numerous tracts of land lying south-east of the point of diversion. The lands so drained by the Lawrence slough and ditch are sections 11, 12, 13 and parts of 14, 7 and 18, in town 18, range 3, and comprise many hundreds of acres. Even if appellant had lost no rights by the Lawrence ditch diversion, he could not, under section 42, have the right to connect these outlying lands with the drainage district. The owners of these lands are not making any application for admission into the district and their lands cannot be assessed for benefits. In no event can the water coming down Lawrence slough and into appellant's ditch be turned into the drainage district tile. On this question the case of *Dayton* v. *Drainage Comrs.* 128 Ill. 271, is in point and conclusive against appellant's position. In its essential facts that case is like the one at bar. There the land owner was seeking to connect his own lands with a drainage district. There, as here, the effect was to drain a large body of other outlying lands. In denying the owner the right to make such connection under section 42 of the Drainage law it was said (p. 277): "But the ditch the defendant is endeavoring to construct involves much more than the drainage of his own lands. Its effect will be to divert into the district ditches the drainage of large tracts of land belonging to other proprietors, but it will not bring those lands within the jurisdiction of the district or subject them to any of its burdens. That the defendant has no power to do, and as the owners of these lands are taking no steps in the premises, they are not brought within the provisions of section 42 of the Drainage act and cannot thereby be included in the district. The construction of the defendant's proposed ditch therefore would give to large tracts of out-

lying lands all the benefits of the drainage system provided by the district without subjecting them to any of its burdens. It is very clear that such results are not within the contemplation of said section 42."

The decree in this case has carefully preserved all the rights that appellant seems to have in the matter of using the drains of appellee.

We find no error in the judgment of the Appellate Court, and the same is accordingly affirmed.

*Judgment affirmed.*