## William A. Latham et al. v. Downs D. Holland et al.

MANDAMUS—*when lies against drainage commissioners. Mandamus* lies at the instance of a property owner against drainage commissioners to compel them to remove conditions of drainage which constitute a wrong and inflict an injury upon his property.

*Mandamus.* Appeal from the Circuit Court of Hamilton County; the Hon. PRINCE A. PEARCE, Judge, presiding. Heard in this court at the August term, 1906. Affirmed. Opinion filed March 15, 1907.

J. H. LANE, for appellants; JAMES M. TAYLOR, of counsel.

THOMAS & ANDERSON and C. S. CONGER, for appellees.

MR. JUSTICE HIGBEE delivered the opinion of the court.

This was a petition for a writ of *mandamus* filed by appellants, twelve of the landowners of the Haw Creek Special Drainage District in the counties of White and Hamilton, Illinois, against appellees, as commissioners of said district, to compel them to do certain further and additional work in order that appellants' lands may be better drained and more fully protected from overflow.

It is alleged in the petition that the Haw Creek Special Drainage District was organized in the year 1900,, and the commissioners proceeded to carry out the purposes for which the same was organized, by causing ditches and drains to be excavated in and through the lands in said district, so as to drain said lands and protect them from overflow and damage, and that said ditches and drains were completed about January 1, 1902; that after the work of making said ditches and drains was completed, it was found by reason of errors in locating and constructing the same, and on account of the failure to construct the main outlet ditch of sufficient and adequate depth, to carry the water which flows into it, the lands of the district were not drained or protected as contemplated, and that some of them received only part of the benefits and some no benefit; that the aggregate width and

depth of certain creeks, which flow into the main outlet drain, are more than twice the width, depth and capacity for carrying water of said main outlet drain, and that in consequence thereof in times of heavy floods and rains, the waters which flow into said drain cannot be carried through the same with sufficient speed and rapidity and that said waters spread out and flow over the surrounding lands and farms, devastating and destroying the crops, rendering the tenements and dwellings uninhabitable and endangering the lives and health of the inhabitants and their personal property; that a large portion of the lands in said district are practically uninhabitable and valueless for farming purposes and to that extent have wholly failed to receive the benefit from drainage in said drainage district, contemplated by the organization thereof; that it is the duty of said commissioners to use the corporate funds of the district to carry out the purposes of the organization, and to provide adequate and sufficient drainage, by enlarging the main outlet drain or to provide such additional outlet for such water as may be necessary to carry out the purposes for which the district was organized; that some of the lands in said district are provided with complete and adequate drainage and have been increased in value by such drainage many fold; that the district, as organized, contains approximately 28,000 acres of land, of which the petitioners own 9,280 acres; that on December 30, 1905, William A. Latham, one of the petitioners, who owns 6,600 acres of the land in said district, presented a petition to the commissioners of the district, stating that by reason of the failure of the commissioners to provide sufficient and adequate drainage to the land in the district, very considerable portions of the land in said district were not drained as contemplated and that some of them received part of or no benefit from the system of drainage established, and asking the commissioners to use the corporate funds of the district, to carry out the original purpose for which the district was organized, and that additional taxes be levied as provided by law if necessary; that on December 30, 1905, the commissioners considered the petition of said Latham, refused to

grant the same and to take any official action as commissioners, to give the relief sought; that by reason of the premises, the petitioners are prevented from having or receiving drainage or protection as contemplated by law, and the organization of the district, and from receiving their just and equal benefits as contemplated when the lands were classified.

The prayer of the petition was that a writ of *mandamus* be directed to the commissioners of said district "commanding them forthwith to proceed to cause the main outlet ditch between the junctions of Auxier creek drain, Big Creek drain, and Wolf creek drain and Skillet Fork river, to be dug of sufficient width and depth to carry the water, which is delivered to it by the various ditches, constructed in said district, or to provide other additional and sufficient drainage and outlets of sufficient width and depth, and of suitable location to carry such water and that such other and further order might be made in the premises as justice should require."

In their answer appellees admit the organization of the district and construction of the ditches named in the petition. They deny that there were any errors in the location and construction of said drains and ditches or of the main outlet. They deny that the main outlet ditch is of insufficient width and depth to carry the water discharged into the same, by the drains mentioned, and allege that the lands of the district are drained as contemplated by the drainage system; that all the lands in said district have by reason of said drainage enhanced in value from two hundred to nine hundred per cent, and that the main outlet ditch does carry all the water emptied and discharged into it by said laterals and drains; that the plans and specifications of said ditches were drawn on scientific principles to take care of the water of the district, but that the contractor in excavating said drains dug and excavated the same larger and deeper than was called for in the contract and larger than was necessary to carry the water flowing into the same. The answer denies that the lands of said district are ever overflowed except in times of

Latham v. Holland.

extreme overflows and heavy rains, when the Skillet Fork river is full and overflowing, and the water is backed up from the river into said ditches, thereby preventing the water from flowing out through the outlet ditch.   It denies that the enlarging, widening and deepening of the main outlet ditch, would be of any advantage in the district and alleges that said lands are drained as fully and completely as practicable.   It denies that the lands of said district or any of them, failed to receive their just proportion of the benefit of drainage.   It alleges that the lands of petitioners are drained by a main outlet and laterals, so as to increase them in value many fold; that the lands of the petitioners were, before the construction and digging of said drains, practically worthless, and none of them worth over $5 per acre, and that since the construction of said drains and ditches, said lands are worth from $25 to $50 per acre.   It alleges that the construction of any additional outlets or drains, or the enlarging, widening or deepening of any of the outlets or drains, would incur an unreasonable tax, which would amount to the confiscation of the land or a large portion of the same, for the payment of the drainage taxes; that taxes have been levied on the lands in the district, for the payment of outstanding drainage bonds, amounting to $100,000, the greater portion of which are unpaid; that much of the land in the district is unimproved and owned by persons of moderate means and if the prayer of the petition should be granted, much of the land would be sold for taxes.

Replication was filed and upon the hearing the court ordered that the prayer of the petition be refused and the petition dismissed at the cost of the petitioners.   From that order the petitioners have appealed to this court.

It appeared from the evidence, that while there are only 28,000 acres of land in the district, the drains and ditches provided for by the system of drainage, received the rainfall from the watershed of some 125,000 acres.   The main outlet ditch of the district is some six miles in length, runs in a northeasterly direction, from its head near the center of the district, and empties into the Skillet Fork river, a tributary

of the Little Wabash, flowing in a southerly and southeasterly direction. The locality at the west end or head of the main ditch is called the junction, for the reason that at this point several ditches or extensions of creeks, come together, conveying their waters to the main ditch. One of these lateral ditches comes from the northwest and is an extension of what is known as Auxier creek which has its source in the high lands of Wayne county, and discharges a large body of water into the main ditch. Another ditch comes from the southwest and carries the waters of Big creek, Ferguson creek and Black branch. Still another ditch comes from the south and carries the waters of what is known as Wolf creek. Between the junction and Skillet Fork, there are also two other lateral ditches, coming from the south running north into the main ditch, one marked on the plat in evidence as the Rader and the other as the East ditch or lateral. The lands lying around the junction are quite low, forming something of a basin, and it is there that the lands of the petitioners are located. Running northeast from the junction is Haw creek, which flows into Skillet Fork about a mile and a half north of the mouth of the main ditch and appears to have formerly been the outlet for the waters collecting at the junction. Since the construction of the ditches in the district, an embankment has been put across Haw creek at or near the junction, to prevent the waters coming from the various ditches to the junction, from using Haw creek as an outlet and to confine them to the main ditch. The total fall of the main ditch, from the junction to the Skillet Fork, is 6.2 feet. The main ditch at the outlet was constructed 14.11 feet deep, 48.2 feet wide at the top and 20 feet wide at the bottom and at the junction it was 7.53 feet deep, 36.6 feet wide at the surface and 20 feet wide at the bottom. The three ditches coming in at the junction and which were to have been each eight feet wide at the bottom, were, for the convenience of the contractors, constructed 12 feet wide on the bottom and their total carrying capacity of water was 2.35 times the capacity of the main outlet to receive and discharge it. The waters of the creeks which these ditches

carried, came from the higher lands and had a greater fall than the waters in the main ditch and consequently the flow of water in such ditches was faster than in the main ditch. The water passing through the ditches since their construction has affected them somewhat and the top of the main ditch, where it empties into the river, is now from 65 to 75 feet wide.

Skillet Fork is the only outlet for the drainage district and below the point where the main ditch empties into it, is a very crooked sluggish stream and is partially filled with logs, brush and other obstructions. Some 20 miles in a straight line southeast from the mouth of the main ditch or about 30 miles following the course of the river, is Carmi, at which point there is a dam in the river erected and maintained by the State of Illinois. The mouth of the main ditch is nearly as wide as the river and the carrying capacity of the river and the ditch at that point is substantially the same. At times, when there is a heavy rainfall the river is unable to carry off the water as rapidly as it comes to it, which causes the water to back up the main drainage canal and act as a dam to the water coming down from the various ditches, through the drainage district. Several times each season since the ditches were dug, they have been unable after heavy rains to carry off the waters as fast as they were received and consequently the lands of petitioners, and probably others, have, to a greater or less extent, been overflowed and upon some occasions their crops destroyed.

It is contended by appellants that they are suffering a wrong under the present conditions of drainage in the district; that it is practicable for the commissioners to remedy the wrong and that they have chosen the right remedy in filing their petition for a *mandamus* against the commissioners. If the first two contentions of appellants be conceded to be correct, then the third should be sustained, as under such conditions *mandamus* against the commissioners would clearly be the proper remedy. Kreiling v. Nortrup, 215 Ill., 195 (116 Ill. App., 448) ; Peotone Drainage District v. Adams, 163 Ill., 428.

Appellees contend that the main ditch conveyed away all the water brought to it and drained the district at all times, except when there was an extraordinary rainfall; that when there was a heavy and extraordinary rain, the water flowing into the drainage district could not be carried off to prevent overflow by any ditch or ditches that could have reasonably been constructed, and that if ditches of sufficient capacity to carry such floods could have been constructed, the Skillet Fork river would not have taken the water away in time to have prevented the overflow of the grounds near the junction, of which appellants are complaining; that the capacity of Skillet Fork could not be enlarged unless its channel were cleared for a distance of 30 miles and that even in that case, the flow of the water would not be much greater unless the dam at Carmi erected and maintained by authority of the State were removed; that the clearing of Skillet Fork, even if possible, under the conditions existing, would cost such an amount of money as to bankrupt the district.

In support of their respective positions appellants introduce some 20 witnesses and appellees 30 witnesses, and the evidence in the record covers some 700 typewritten pages. It would be manifestly impossible to review all this evidence within the scope of this opinion, nor is it necessary, as hundreds of pages of the testimony contain mere reiteration or corroboration of what has been said by preceding witnesses. It is sufficient to say that as a rule appellants' witnesses testified to facts tending to support the position taken by appellants, while those introduced by appellees testified to facts tending to support the position taken by appellees. We are of opinion that it appears from the record that the lands within the district, including appellants', are reasonably well drained and are protected from overflow in times of ordinary rains, but that in times of extraordinary rains, floods, or freshets the ditches, as constructed, are insufficient to carry off the water flowing into the drainage district in time to prevent an overflow of certain of the lands.

Section 17 of the Farm Drainage Act, Rev. Stat., chap. 42, par. 91, provides: "Upon the organization of a drain-

age district, the commissioners shall go upon the land and determine upon a system of drainage, which shall provide main outlets of ample capacity, for the waters of the district, having in view the future contingencies, as well as the present." And section 41 of the same act provides that "after the completion of the work, the commissioners shall thereafter keep the same in repair and if they find by reason of error in locating or constructing the ditches, or any of them, or from any other causes, the lands of the district are not drained or protected as contemplated, or some of them receive partial or no benefit, they shall use the corporate funds of the district to carry out the original purpose, to the end that all the lands so far as practicable shall receive their proper and equal benefits, as contemplated when the lands were classified. * * * Provided, in all such cases if sufficient funds are not on hand, the commissioners shall make a new tax levy."

In the case of Peotone Drainage District v. Adams, 163 Ill., 428, where these two sections of the statute were under consideration, our Supreme Court said, that the section of the statute requiring the drainage commissioners to provide outlets of ample capacity for the waters of the district, was mandatory and where landowners in the district have been assessed and taxed, for the purpose of constructing drains and ditches of sufficient capacity to drain their lands, they have a right to insist that the commissioners shall adopt a system of drainage, which shall provide main outlets of ample capacity for the waters of the district; and as in that case, the commissioners had committed an error in not constructing a drain deep enough to drain the lands of the appellee, and his lands had received no benefit from the improvement, although he had been taxed to make the same, the court held that the commissioners could be compelled by *mandamus* to properly drain his lands.

In this case the lands of appellants were marked 100 by the commissioners, indicating that the per cent of benefit received by them was of the highest class and they were assessed at the highest rate. These lands which are shown

to have had little or no value before the formation of the district appear to have been partially reclaimed and to have acquired considerable market value. But they are not fully protected and they therefore had a right to insist that the drainage commissioners should construct a ditch or ditches of sufficient capacity to fully protect their lands from overflow, if it could be done, provided the cost of the whole work, both that done and to be done, did not when completed, exceed the benefits to be derived by the district therefrom.

The question therefore, whether the commissioners could give the relief sought for, was a vital one and to it a large portion of the testimony above referred to was directed. It was necessarily somewhat conjectural in its nature and called for the best judgment of the witnesses, as to what could be done in that direction.

Witnesses swore on behalf of appellants that either by the enlargement of the outlet ditch or the cutting of another outlet ditch to take care of the waters coming from the south, and discharging into Skillet Fork one and a half to two miles further south than the present ditch, and by clearing out Haw creek, the waters coming down in the laterals could be taken care of, except in case of back water from Skillet Fork. On the other hand an equal or greater number of witnesses on behalf of appellees swore that ditches of sufficient size to drain the bottom in time of extraordinary rain could not be constructed for the reason that Skillet Fork could not carry the water off fast enough; that the main ditch was adequate to carry away the water from the laterals when there was no water in the Fork; that there have been floods in the district in the last two years when neither the ditch nor Skillet Fork nor the Wabash river could carry the water away; that when Skillet Fork gets to a certain stage, the water in the main ditch flows backwards towards the junction, where it meets the head waters and comes to a standstill; that Skillet Fork is really not large enough to carry its own water in times of extraordinary rain; that the land is lower at the junction than it is on the banks of Skillet Fork.

Latham v. Holland.

The testimony on behalf of appellees is also corroborated in this respect to some extent by the fact that although the outlet ditch has washed out and become much larger than when first constructed, it does not seem, so far as the evidence shows, to have given any more relief to the lands affected by overflow than at first. What is said by the witnesses in reference to Skillet Fork carrying the waters of the main ditch, is, applied also to waters which would be carried into it by an additional ditch. In fact one witness swore that the construction of additional ditches into Skillet Fork, would simply be the opening up of another channel for the water to back up from Skillet Fork in flood time and that more lands would be flooded in times of excessive rains than there are now.

The evidence upon the whole was such as to have clearly warranted a finding on the part of the court below that Skillet Fork as it existed at the time of the trial was not of sufficient capacity to carry any more water or even to carry that which was then conveyed to it in times of extraordinary rain and that the enlarging of the present main outlet or construction of another outlet, would have been unavailing to protect the lands of petitioners from the overflow of extraordinary rains and floods. Nor does it appear that the commissioners could cause Skillet Fork to be cleared out or deepened so as to carry the increased flow of water brought to it by larger and additional ditches. Such work if attempted on the part of the commissioners would require them, according to the evidence, to take charge of Skillet Fork for a distance of thirty miles below the mouth of the main outlet, and probably deepen, straighten and clear it out at an expense which is not even estimated by the witnesses, but which it is claimed by appellees, would amount to hundreds of thousands of dollars and practically bankrupt the district. It also appears that to make such work effective, would also require the commissioners to remove the dam from the river at Carmi, erected and maintained by the State, which they have no authority to do.

The court below saw all the numerous witnesses upon the

witness stand, heard their testimony, decided the issues in favor of appellees and dismissed appellants' petition. We cannot see from an examination of the record that the trial court committed any error in the trial of the cause, or was not warranted by the evidence in finding as it did, and its order dismissing the petition will accordingly be affirmed.

*Affirmed.*