### R. B. Stoddard, Appellant, v. Daniel Keefe, Francis O'Neil and Walter Cooney, Drainage Commissioners of Drainage District No. 1 of Town of Hahneman, County of Whiteside, and State of Illinois, Appellees.

### Gen. No. 6,291.

1. DRAINAGE, § 91*—*when feasibility of improvement of drainage ditch question of fact.* In a mandamus suit to compel drainage commissioners to so improve a drainage ditch as to prevent overflow on petitioner's land, the feasibility of so doing *held* to be a question of fact for the trial court.

2. DRAINAGE, § 87*—*what is duty of drainage commissioners in construction of ditches.* While drainage commissioners are charged with the duty to furnish a sufficient channel for a drainage ditch, if it can be reasonably done, they are not required to expend large sums of money on schemes or experiments of doubtful benefit or utility.

3. DRAINAGE, § 90*—*when mandamus will not lie to compel drainage commissioners to make improvements.* A proposed improvement of a drainage ditch, *held* to be of such doubtful utility and effectiveness to prevent overflows as to justify the denial of a writ of mandamus to compel drainage commissioners to make such improvement.

4. DRAINAGE, § 101*—*what does not constitute taking or damaging land.* Allowing surface waters to drain upon lower lands or causing such water, which would otherwise evaporate or seep

through the soil, to be precipitated upon lower lands by artificial drainage, is not taking or damaging land, though without compensation made, in violation of the State constitution.

5. DRAINAGE, § 91*—*when proposition of law on duties of drainage commissioners correct.* Propositions of law as to duties of drainage commissioners in determining upon a system of drainage; to keep ditches in repair; to remedy errors in location and construction of ditches; and to furnish an outlet sufficient to meet changing conditions in flow of water, *held* correct.

6. DRAINAGE, § 91*—*when propositions of law as to duties of drainage commissioners in enlarging ditch properly modified.* Insertion of the phrase "so far as practicable" in holdings of propositions of law as to the duties of drainage commissioners to enlarge a ditch, sufficient when constructed, so as to take care of additional flow of water into it resulting from ditches subsequently constructed in other districts, or from the construction of additional laterals and more extensive use of tile, *held* correct.

7. DRAINAGE, § 87*—*what not duty of commissioners in altering construction of ditch.* It is not the duty of drainage commissioners to so alter the construction of a ditch as to prevent the overflow of water on a landowner's land, regardless of cost, since lands in a district cannot be assessed for a sum greater than the benefits derived from an improvement.

8. DRAINAGE, § 91*—*when action for writ of mandamus to compel drainage commissioners to remedy defective conditions in ditch accrues.* To entitle a landowner to a writ of mandamus to compel drainage commissioners to remedy defective conditions in a ditch, demand must be made within a reasonable time after the condition complained of arises, and suit brought within five years after such demand.

9. DRAINAGE, § 91*—*when statute does not run against right to bring mandamus to compel drainage commissioners to remedy defective conditions in ditch.* So long as a landowner does not know the cause of the insufficiency of a drainage ditch and is diligent in seeking the cause thereof, the statute of limitations does not begin to run against a right to bring a mandamus suit to compel the commissioners to remedy such condition.

10. DRAINAGE, § 91*—*when statute not bar to mandamus suit to compel commissioners to repair ditch.* If the insufficiency of a drainage ditch is due to failure to keep it in repair, the statute of limitations is no bar to a mandamus suit to compel the commissioners to remedy such condition.

11. DRAINAGE, § 90*—*when commissioners may be compelled to remedy defective conditions in drainage ditch.* It is not a defense

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

to a mandamus suit, to compel drainage commissioners to remedy defective conditions of a ditch, that lands in the district other than those of the petitioner are sufficiently drained and will not be benefited by the improvement sought by the petitioner.

12. DRAINAGE, § 87*—*when commissioners no right to spill water from ditch.* Drainage commissioners have no right to collect waters from lands distant from their district, convey them in artificial channels and spill them in large quantities upon lands in their district out of the natural course of their drainage.

13. DRAINAGE, § 91*—*when petition for writ of mandamus properly dismissed.* A petition for writ of mandamus to compel drainage commissioners to remedy a defective condition in a ditch, *held* properly dismissed where such condition existed more than five years before filing of the petition, and, if the petitioner did not know of it before such period, it was so obvious that he should have known of it.

14. MANDAMUS, § 6*—*when lies.* Mandamus lies only where there is a clear legal right to have an act performed which it is the defendants' duty to perform in the manner asked.

Appeal from the Circuit Court of Whiteside county; the Hon. FRANK D. RAMSAY, Judge, presiding. Heard in this court at the April term, 1916. Affirmed. Opinion filed August 10, 1916.

M. A. STIVER and CLYDE SMITH, for appellant.

CARL E. SHELDON, for appellees.

MR. JUSTICE CARNES delivered the opinion of the court.

This is an appeal from a judgment rendered against the petitioner, R. B. Stoddard, in a mandamus suit prosecuted by him against appellees, as commissioners of a drainage district organized under our Farm Drainage Act, to compel them to widen, straighten, deepen and repair their main ditch from the right of way of the C. B. & Q. R. R. Co., to its outlet in Green River, about two and one-fourth miles, so as to prevent overflow and damage to appellant's half section of farm land abutting that part of the ditch. The case

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

was tried by the court without a jury on pleadings, stipulations and evidence, presenting the questions: (1) Whether the part of the ditch sought to be improved is now reasonably sufficient for the purpose for which it is used? (2) Whether appellant's land has been damaged by overflow because of an insufficiency of that part of the ditch? (3) Whether, if that part of the ditch is insufficient, it can reasonably be enlarged and its present banks raised in the manner demanded by appellant? (4) If the above three questions are answered in the affirmative, whether appellant is barred by the statute of limitations or by laches from demanding in this proceeding the relief sought?

The controlling questions are of fact, upon which the court heard much testimony. It appeared that prior to 1881 there was about 25,000 acres of land near Green River that was for a large part uncultivatable because of swamps and ponds, and therefore of little value; that it was capable of drainage into Green River by artificial means through large open ditches which would furnish outlets for tiling (we understand that the water on this land accumulated from surface drainage with a natural outlet, so far as it had an outlet, into Green River); that in 1881 appellees' farm drainage district embracing about 7,000 acres near the river was organized, including all of sec. 32, T. 19 N., R. 7, in Whiteside county, Illinois, the east half of which section is now owned by appellant; that some work was done with teams and scrapers at about that time to construct a channel that would somewhat confine surface water in its course over that territory to the river; that afterwards in 1885 a classification of the lands in this district for the purpose of assessments for improved drainage was made, in which classification the east half of said section was set down at 90 and the west half at 70; 100 would indicate the highest assessment per acre to be made in the district. The scale of classification of all the lands ranged from 5 to

100, therefore we suppose the east half of section 32 was mostly unfit for cultivation and was presumed to be greatly benefited by the proposed improvement, though not necessarily all of it, even when tiled into the drainage ditch, fit to raise a corn crop in a wet season. One Phebe Carter then owned the whole section and paid her assessment. A ditch with a twenty-five foot bottom down to sand was constructed from the upper part of the district to its southern boundary at the south line of said section 32, and thence south about half a mile to Green River. It extended along the entire east line of said section 32. At about this time three other drainage districts were formed embracing the rest of said 25,000 acres of wet lands, and contracts were made between the commissioners of appellees' district and the commissioners of said other districts respectively, permitting connection with the main channel of appellees' district. Before 1899, the last of these improvements was completed and the entire water from the whole territory was discharging through this main channel of appellees' district from artificial drains the same as now, except no doubt from time to time the flow of water was affected by different owners of land in the various districts tiling into the open ditches.

In the part of the ditch here sought to be improved the volume of water is, and all the time has been, at times so large that reliance must be placed on the banks elevated by the deposit of soil in excavating the ditch to confine it to the artificial channel. Appellant bought all of said section 32 in 1899, and sold the west half of it in 1912. In August, 1914, he served notice on appellees that the main ditch from the right of way of the railroad south to its outlet is not of sufficient width, depth and capacity to furnish ample and sufficient drainage to his land and other tributary lands, and to prevent wash and overflow, and that he therefore demands that appellees proceed to deepen, widen

and straighten the ditch and make sufficient banks thereto so that it will be of sufficient width, depth and capacity to furnish the necessary outlet to drain petitioner's lands and other tributary lands, and prevent wash and overflow. Appellees, failing to comply with this demand, this suit was commenced to the April term, 1915, of the Circuit Court of Whiteside county. The petition filed prayed that appellees be compelled to make the improvement, using language substantially the same as used in the demand. Answers were filed, among other defenses setting up the statute of limitations, but the case was tried on a stipulation that all evidence might be received which would have been competent and admissible upon proper pleadings either on the part of the petitioner or respondents. It was not sought on the hearing to compel any improvement substantially other or different from that designated in the demand, and the argument here rests on the proposition that substantially that improvement should be ordered by the writ of mandamus.

It is clear that appellant's farm has been benefited by the improvement and become valuable farm land, but that crops grown on a portion thereof are subject to damage from floods in extremely wet seasons, especially corn crops. He testified that during the fifteen years that he had owned the land he had seen it overflowed three times, and had seen the effects of overflow probably six or eight times. (He does not reside on the farm.) Another witness testified that it overflowed at some time during the year about eight times in the last ten years. Some of these times were in the early spring when most of such lands overflowed without damage. In 1915, after this suit was begun but before the trial, the tenant on the place lost from flood a considerable portion of his corn crop. In the present condition of drainage an extreme wet season will be unfavorable to cropping a part of the premises. Be-

cause of such danger some considerable part may have to be devoted to pasture or hay land, which temporary floods do not so much damage. Lands of that kind are of less market value than if capable of all farm uses.

Much testimony is devoted to the real occasion of this water on appellant's land. Appellant's evidence tends to show that the main ditch is not deep enough or wide enough, and the banks are not high enough to confine the waters in extreme wet times, and that there is a break in the banks above appellant's lands where the water flows through in large quantities and down a natural depression upon his premises. Appellees' evidence tends to show that the condition of appellant's lands complained of is due to many causes: From the waters setting back from Green River in the main ditch, and failure of traps on appellant's tile drains to check the intake because they were permitted to get out of repair; that the banks of the ditch are often getting out of repair by reason of work of muskrats and other causes, and waters break through at various places. Appellees also claim that it is impossible that the water comes from an overflow at the north, as claimed by appellant. Their witnesses also testify to what is common knowledge of people living in this part of Illinois, that the summer of 1915, which is used as the most striking example of damage from floods, was an extremely wet season and that it was no uncommon occurrence that lands sufficiently drained for ordinary seasons were flooded because of the incapacity of the artificial drainage to meet the unusual demand. It is not clear just what was the occasion of damage to appellant's lands. His counsel argue, when their attention is turned to the statute of limitations and the defense of laches, that he did not know until a short time before making his demand how the trouble originated or how it could be remedied. This supports the presumption raised by other testimony that those questions are quite doubtful.

The drainage ditch cannot be reduced to a lower level than Green River, its outlet. Appellees have no control over that river. It was dredged a few years ago and their drain washed out and deepened in consequence thereof and was substantially improved, but the bottom of Green River, as well as of appellees' main ditch, is sandy. The river filled up again to about its old level and conditions now are about the same as before the dredging. Appellant introduced the testimony of a civil engineer that the part of the ditch in question was not wide enough or deep enough, and he recommended a scheme for deepening and widening it. He admitted that it could not be permanently deepened if there was a sand bottom, and said that the dykes formed by the earth thrown up at the sides of the ditch were necessary factors in controlling the overflow; that if the ditch were widened and new dykes constructed they would not for sometime be as strong as the present dykes that have healed and hardened with age and the growth of vegetation and trees. He recommended that the dyke on appellant's side of the ditch stand and the dredging be done entirely on the other side. It seems clear that this would imperil that landowner. Appellees called witnesses, some educated as civil engineers and others only experienced in matters of drainage, who testified that in their opinion, everything considered, the present ditch was capable of doing as effective work as the proposed enlarged ditch would do; that it could not be deepened because of the sand bottom and the level of Green River; that the banks were solid and could easily be kept in repair, while new banks would require much time to get in firm condition. It also appeared that the expense of the proposed enlargement would be about $12,000.

It would unduly extend this opinion to discuss in detail the conflicting evidence as to the feasibility of enlarging the ditch as demanded by appellant. It was a question of fact to be decided by the trial court after

seeing the witnesses and hearing them testify. Appellees are charged with a duty to furnish a sufficient channel, if it can reasonably be done. They are not required to expend large sums of money on some scheme of very doubtful benefit. The court in this proceeding was not authorized to compel a costly improvement that the evidence shows was an experiment quite as likely to result in no benefit as otherwise.

As we read the evidence it shows that the part of the ditch in question is not now sufficient to perfectly answer the purpose for which it is used; that appellant's land has been damaged by overflow of water that could have been prevented by an ideal ditch; that it is impossible to construct an ideal ditch that will protect appellant's lands and other lands similarly situated because of the high level of the Green River bottom and of the sand subsoil under appellees' ditch; that whether the ditch remains at its present width, or is increased to a greater width, there will troubles arise from time to time from breaking of the banks in high water, either from above or backing up from below, and that such troubles will have to be constantly guarded by the drainage commissioners and the owners of lands subject to overflow; that the change demanded by appellant is in the nature of an experiment of very doubtful utility and therefore that appellees were justified in refusing to make it, and much less would the court have been authorized in this mandamus proceeding to compel it.

Appellant urges that casting water upon one's premises is a taking or damaging of property, and, if without compensation, is in violation of our constitution, citing cases where properties have been so wrongfully damaged, and says that the water complained of here is not from surface drainage of the 7,000 acres of land within the district, but comes from other lands. We do not see much application of this argument to the facts of this case. As before said, we suppose it is all

a matter of surface drainage and not a question of disposing of waters that come from subterranean lakes and streams. Owners of lower lands are subject without redress to damage from surface drainage of higher lands owned by others, even though waters are precipitated upon the lower lands by artificial drainage that would otherwise evaporate or seep through the soil. This principle was established in the case of *Peck v. Herrington,* 109 Ill. 611, and has been repeatedly reaffirmed in later Illinois cases citing that case.

The court, at the instance of appellant, held as law as follows except by the insertion of the phrase, "So far as practicable," which in the following statement we have inclosed with brackets, that: "It is the duty of drainage commissioners to determine upon a system of drainage which shall provide main outlets of ample capacity for the waters of the district, having in view the future contingencies as well as the present," and "to keep the ditches of the district in repair," and: "If it shall be found that by reason of error in the location or construction of the ditches, or any of them, or from any other causes, the lands of the district are not drained or protected as contemplated, or some of them receive partial or no benefit, it is the duty of the commissioners to use the corporate funds of the district to carry out the original purpose to the end that all the lands so far as practicable shall receive their proper and equal benefits as contemplated when the lands were classified." That if when defendants' district was first established its outlet was of sufficient capacity for the then demand, and afterwards ditches of great length and capacity of other drainage districts were permitted to empty into defendants' ditch and thereby burden it beyond its capacity, it would be the duty of defendant commissioners "to correct said insufficiency [as far as practicable] and furnish an outlet or outlets of sufficient capacity for the increased

volume of water carried into it''; that ''if the demands upon the outlet of a drainage district continue to grow and its relative capacity continues to diminish, the obligation of the commissioners to furnish an outlet of sufficient capacity correspondingly continues''; that if the outlet was originally of ample capacity, still, if the demands upon it either because of other lands being drained into it by other drainage ditches, or by more minute drainage into existing ditches, as for instance by more extensive use of tile or additional laterals, so increased as that it becomes insufficient, the duty to furnish an outlet of ample capacity continues and requires the commissioners to improve such ditch so as to fulfil that duty. [So far as practicable.]

On the question of the statute of limitations and laches, the court refused to hold for appellant that a cause of action to petition for mandamus did not accrue until a demand had been made upon respondents to perform the duty which is the object of the mandamus suit, and that the petitioner was not required to make such demand until he had notice of the facts upon which this duty is based, and that he has in law five years within which to make a demand after notice of the default, or that he has a reasonable time within which to make a demand after he has notice of the conditions which he seeks to have remedied through his mandamus suit, and substituted the proposition that ''Demand must be made within a reasonable time after the condition complained of arises, and suit brought within five years after such demand.'' The court held appellant's propositions that if the outlet in question was gradually becoming insufficient and the petitioner and respondents did not know the cause, but were reasonably diligent in seeking to find the cause, but failed to do so, then so long as this was the fact the statute of limitations would not run against this mandamus suit; that ''If the alleged insufficiency of the outlet is due to

a failure to keep the same in repair, the statute of limitations is not a bar to this action"; that "It is not a good defense to this petition that other lands in the district are sufficiently drained and will not be benefited by the improvement sought by petitioner"; that the defendant district "has no legal right to collect waters from lands miles away and convey them in artificial channels and spill them in large quantities upon petitioner's lands *out of the natural course of their drainage.*"

The court held the law fixing appellees' duty as claimed by appellant with the exception of holding that appellees were only required to act "so far as practicable." Appellant argues that the question of practicability does not enter into the case; for instance, that the court should not have concerned itself with the question of cost; that there was an imperative duty on the defendant commissioners regardless of feasibility, practicability, or costs. We do not take this view of the law. The commissioners certainly could not have assessed the lands of the district for a greater sum than the entire benefit to the district because it could assess no landowner in excess of the benefits to his lands. (*People v. Chicago & I. Traction Co.,* 267 Ill. 510; *Drainage District No. One v. Dowd,* 132 Ill. App. 499, 506.) We have no occasion to determine here the law as to appellees' duties as held by the court other than as just stated, but we think on the authority of *Latham v. Holland,* 133 Ill. App. 144; *Peotone & M. U. Drain. Dist. v. Adams,* 163 Ill. 428; *People v. Henry,* 236 Ill. 124, the holding was correct on that question, as well as to the propositions asked by appellant as the one to which he objects.

We are of the opinion also that the court correctly held the law on the question of the statute of limitations and laches (*Meents v. Reynolds,* 62 Ill. App. 17, 23) where this court said, citing authorities: "There is as much need for the application of the statute of

repose in this class of cases as in others." These holdings of law do not enable us to determine on which ground the court dismissed the petition. We think the record fairly shows that the present condition complained of is not substantially different from what it was in 1899 when appellant purchased the land. If the ditch is obviously too small, it was then so, and if it is reasonably certain it should be remedied in the way petitioner demands, it should have been then so remedied; and if the defendant did not know of the trouble more than five years before beginning this action, he should have known of it if it was certain and obvious, as he now claims; and if the court adopted his view of the damage, its cause and its remedy, he might well have held him barred by the statute of limitations or laches. If, on the other hand, the court took the view of the facts that we have hereinbefore expressed, the petition was properly dismissed without regard to the question of laches.

It is settled, oft-repeated law that mandamus lies only where there is a clear legal right to have an act performed; an act that it is the defendant's duty to perform. It does not lie in a doubtful case. The relator must show a clear legal right to have the thing sought by it done, and in the manner asked. (*Swigert v. County of Hamilton,* 130 Ill. 538, 549; *Chicago & E. I. R. Co. v. People,* 222 Ill. 396; *McGann v. People,* 194 Ill. 526.) We find no error in the record, therefore the judgment is affirmed.

*Affirmed.*