542    APPELLATE COURTS OF ILLINOIS.

Deterding v. Central Illinois Public Service Co., 231 Ill. App. 542.

## G. A. Deterding et al., Appellees, v. Central Illinois Public Service Company, Appellant.

### Gen. No. 7,589.

1. WATERS AND WATER SUPPLY—*sufficiency of evidence of damage to upper lands from dam.* A decree of mandatory injunction ordering the removal of a dam will not be reversed on appeal as against the weight of evidence, which is conflicting, where it shows that the construction of the dam in question raised the water level of the upper lands, retarded the natural flow of the stream so as to hold overflow waters for a longer period during flood conditions and impeded drainage at all stages of water, interfered with the tile drainage systems of the complainants and caused serious damage to growing crops almost every year although prior to the construction of the dam flood damages to complainants' land had occurred infrequently and only in extreme flood stages, especially where it has previously been adjudged in actions at law that the construction of the dam has been and will be a recurrent cause of damage to growing crops.

2. INJUNCTIONS—*propriety of mandatory injunction in disregard of alternative relief under prayer for general relief.* A mandatory injunction for the removal of a dam across a natural watercourse granted on a bill by upper riparian owners charging that unless defendant be compelled to remove the dam or "provide sufficient outlets for the drainage of the water coming from complainants' lands, of as ample capacity as existed in a state of nature, irreparable and recurring damage" would result, will not be reversed for failure of the chancellor to adopt the alternative after complainants had offered evidence relating thereto, where there is no evidence showing the reasonableness or practicability of any method of avoiding injury to the upper lands not involving removal of the dam, or from which it can be determined what other relief could be granted than that granted, and the bill prayed for general relief.

3. WATERS AND WATER SUPPLY—*when public interest no defense to unlawful interference with riparian rights.* Public interest or inconvenience resulting therefrom cannot defeat the granting of a mandatory injunction for the removal of a dam across a natural watercourse at the suit of upper riparian owners whose lands have been and recurrently will be flooded and damaged as the result of the construction and maintenance of such dam by an electric power company engaged in furnishing electric current to the general public throughout a large area, where it is admitted by

THIRD DISTRICT—OCTOBER, ·1923.        543

Deterding v. Central Illinois Public Service Co., 231 Ill. App. 542.

the answer that the dam was constructed and maintained unlawfully and not under any contract or covenant, that complainants are the owners of the dominant right, and have recovered a judgment for damages from the obstruction and maintenance thereof and the evidence shows that they have been and will be damaged and will suffer irreparable injury therefrom.

4. WATERS AND WATER SUPPLY—*when laches no defense to injunction for abatement of unlawful obstruction.* The doctrine of laches has no application to a suit by upper riparian owners for a mandatory injunction for removal of a power dam across a natural stream where the evidence shows that the original dam was built in 1913, and destroyed by the elements in 1920, that complainants commenced litigation in regard thereto which has been pending since 1916, and that during the pendency of the injunction proceedings the dam was rebuilt of concrete, and it is admitted by the answer that complainants are the owners of the dominant tenement, that the river is a natural watercourse, that the dams were constructed and maintained without any legal authority, and that complainants have recovered a judgment against defendant for damages resulting therefrom.

5. WATERS AND WATER SUPPLY—*unlawful obstruction not permanent in law.* A concrete dam unlawfully constructed in the bed of a natural watercourse to the damage of upper riparian proprietors is not a permanent structure in law, as against such proprietors suing for a mandatory injunction for its removal, where it obstructs the free flow of the water from their lands, and their right to have such structure abated as a nuisance is not affected by the permanent character thereof, especially since it was constructed during the pendency of the injunction proceedings.

HEARD, P. J., dissenting.

Appeal by defendant from the Circuit Court of Christian county; the Hon. F. R. DOVE, Judge, presiding. Heard in this court at the April term, 1923. Affirmed. Opinion filed October 26, 1923.

JAMES VAUSE, JR. and CARL D. KIGER, for appellant; HOGAN & REESE, of counsel.

LESLIE J. TAYLOR, for appellees.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

This is an ·appeal by the Central Illinois Public Service Company, appellant, from the decree of the cir-

544    APPELLATE COURTS OF ILLINOIS.

Deterding v. Central Illinois Public Service Co., 231 Ill. App. 542.

cuit court of Christian county, entered at the August term, A. D. 1922, granting appellees (complainants) a mandatory injunction, directing and commanding appellant (defendant) to tear down, abate and remove a dam constructed by appellant across the south fork of the Sangamon river.

The facts in this case have been before this court in two different cases by two different appeals, being appeals from judgments in favor of appellee Deterding and against the appellant for damages resulting to crops on his lands for the years 1915 and 1916, the first judgment being reversed on account of errors in instructions and the last judgment being affirmed (223 Ill. App. 374).

The proof disclosed the fact that appellee Richardson owns land approximately one-eighth mile southeast of the dams in question; the appellees Deterding, Stork, Clearlock and Vollentine, land about two miles to two and one-half miles above the dams in question, and appellee Taylor, land about three-fourths of a mile above the dams in question, and that all of these parties except Stork have owned and possessed their lands for many years prior to the construction of the dams. The lands affected are rich and productive and portions of them have been thoroughly improved with tile drainage; other portions are woodlands and pasture lands, but all are the dominant heritage, as compared with appellant's tract of land, and all of them are wholly dependent upon the south fork of the Sangamon river for their drainage. The watercourse of the south fork of the Sangamon river affects the lands in controversy, shown to be from fifteen hundred to two thousand feet in width.

The south fork of the Sangamon river has two head waters in the eastern part of Shelby county, entering Christian county near the northeast corner and meandering in a westerly and southerly direction, passing southerly of the City of Taylorville, and thence in a northwest direction across the lands of the ap-

pellees; thence across the forty-acre tract of the appellant, and thence in a northerly course to its junction with the north fork of the Sangamon river, upon the north line of Christian county.

Prior to the year 1913 the Chicago & Illinois Midland Railway Company constructed a bridge across the river just northerly of the dams in question, and straightened the channel of the river so that the river took a straight-line course from a point southerly of the bridge to a point north of the bridge, cutting off some of the bends of the river in its natural state.

Some time in the year 1913 the appellant became the owner of forty acres of land described in the amended bill, and constructed a power plant upon this forty-acre tract, just west of the bed and course of the river, and thereafter constructed a dam across the Sangamon river from bank to bank a few hundred feet south of the railroad bridge, said dam being constructed of piling, timbers, some rock and earthwork. The original dam had an elevation from the bed of the stream of about four and one-half feet. To the west of this dam the appellant constructed a cooling basin in the bed or course of the river, approximately in the old channel, by excavating a large pond about three hundred feet in each dimension, and used the dirt from the excavation to build an earthwork levee around three sides of the cooling basin or pond, the fourth or west side being formed by the natural elevation of the ground. This levee extended from the high ground easterly about one hundred yards into the bed of the river. Thereafter the appellant increased the elevation of the original dam by constructing a superstructure about thirty inches in height, composed of planking, making the dam of a total elevation of approximately seven and one-half feet, bringing the top of the dam to a point about four and one-half feet below the banks of the river at either end, then constructed wings at either side of the dam

and piled earth, crushed stone and other materials at either end of the dam for the protection of the same. There were no gates, openings or sluceways constructed, in connection with said dam, or the superstructure on top of the same.

This dam continued in place until about the month of September, A. D. 1920, when it began to give way as a result of natural deterioration and decay. Thereupon, appellant, while the original bill of complaint in this cause was pending, proceeded to construct a concrete dam across the channel of the stream at a point about one hundred feet north of the original dam.

A motion was entered for an injunction *pendente lite,* and a hearing had and a temporary injunction issued but appellant was permitted to complete its dam to the height of the original dam, to wit, about four and one-half feet, the same to be without prejudice to the rights of the parties to this proceeding.

The main channel or thread of the stream at the point in question is sixty to seventy feet in width from bank to bank and averages about ten feet in depth. Before the construction of the first dam across the channel of the stream, in times of low water, the channel would go dry in places, but since the dam was built the river never goes dry so far as affecting the lands of the appellees.

The evidence tended to show that prior to 1913, in case of extraordinary high water some damage was caused to the crops of appellees on their various lands, but that substantially crops were raised upon the cultivated land practically every year with little or no damage, but that since the construction of said dam the crops have been damaged every year.

The proof disclosed that as a result of the obstruction to the free flow of the water by the dams in question, the water, at low-water periods, stood much higher in the channel of the stream, and that, by reason of this condition, a smaller rainfall caused the

river banks to fill with water and spread out over the lands and to rise above the outlets of the tile drainage emptying into the channel of said river; that ever since the construction of said original dam, the waters have come out of the banks with less rainfall, and have remained out of the banks and spread over the adjacent land longer than ever before known to the appellees and others who have known the river and lands adjacent thereto for a great many years.

It appeared by the proofs that the dams in question have so retarded the flow of water away from the lands of the appellees that the water, once it rises above the banks of the river and spreads over the adjacent lands, remains upon the lands from three to six days longer than it ever had before the dams were built by the appellant.

The evidence further disclosed that prior to the construction of these dams, the tiles of the appellee Deterding were free from sediment and deposit, were efficient in draining out the lands and had an outfall of four or five feet above the bottom of the channel, and, except in times of floods, the outlets of the tile were open and efficiently drained out his lands; that since the construction of the dams, by reason of the water standing in the channel of the river at all times, a much smaller rainfall causes the water in the channel of the river to rise more quickly above the tile outlets, thereby affecting the efficiency of the system of tiles with consequent loss and damage to the crops growing upon the lands tributary to the Deterding system of tile drains.

There was evidence tending to show that the fall of the natural surface of the ground between the Deterding land and the location of the dam was 2.56 feet, and the difference in the water level near the northeast corner of the Deterding land and the water level a few feet south of the dam was 2.07 feet, while the water level between the same point on the Deterding land and a point forty-five feet north of the dam was

5.99 feet, tending to show that the original dam had raised the water level above the dam 3.92 feet higher than it would have been if the dam had not been constructed.

There is much evidence in the record of an engineering nature and as to the surface and contour of the locality, all of which does not agree. For example, appellees' engineers testify that, when a very small amount of water flows over the dam it causes a retardation in the level of the stream above the dam to the amount of two feet, and that the percentage of retardation is lessened as the water increases in height flowing over the dam; that the water would have to rise to a point about six feet above the top of the dam before the dam ceases to be any obstruction to the flow of the water. And appellant's engineers testified that when the water was two feet above the crest of the dam it would raise the stage upstream to the dam about six-tenths of a foot or about seven inches, and it is conceded that the retardation caused by the dam would have an effect for four miles upstream. The Deterding lands are about two and a half miles above the dam.

Appellees had various measurements taken in 1917, at a time when the stream was at an ordinary height, and found the outlet to appellee Deterding's tile 2.16 feet above the surface of the water, and as to other measurements and data taken by appellees there is some variation as to the exact engineering figures and as to the exact situation as to the retardation of the flow of the stream and local conditions. Yet this evidence, together with many witnesses that had known the locality and testified as to actual conditions, tended to show that the construction of the dam had retarded the flow of the water and had caused overflow and damage to complainants' lands and crops and had seriously interfered with the operation of the tile drainage constructed by appellees, there being evidence tending to show that the increased depth of

the pool and body of the stream had created sediment and disturbances which entered the tile and affected its efficiency.

There is also much evidence as to high-water periods in former years before the construction of said dam, and that occasional damage was caused at such periods and especially is there in the record much contention as to an extraordinary rainfall in 1915, one of the heaviest ever known in that section, and it was contended that, under natural conditions and without the obstruction, such rainfall at that time would have caused the same serious damage that was caused with the dams in.

Much evidence is submitted by appellant as to the government precipitation records from 1906 down to date. It appears that a gauge was established on the Chicago & Illinois Midland railway bridge in 1917 and a previous gauge had been maintained at the Wabash railroad bridge which crosses the south fork of the Sangamon river some distance above the lands of complainants, and that the readings of these gauges, together with the precipitation records, were in harmony, and allowing sufficient time for the flow of the water from the points where the observations were made it indicated that the construction of the dam had not seriously or materially affected the raise or overflow of the water to complainants' lands.

The evidence was all heard in open court by the chancellor, who found the facts adversely to appellant's contention, hence, this case is subject to the rule that courts on appeal will not disturb the findings and decrees of the chancellor who hears the evidence, unless, from a review of the evidence, the court on appeal is satisfied the decree is so manifestly against and contrary to the weight of the evidence that it ought not to be allowed to stand. *Pinkstaff v. Steffy,* 216 Ill. 406; *Keller v. Fitzgerrell,* 158 Ill. App. 534; *Kallista v. Ahalt,* 158 Ill. App. 255.

In addition, appellee Deterding, having brought an

action at law for injury to his crops during the years 1915 and 1916, and having established by a judgment of court that the construction of this dam caused the injury, this court is not inclined to go further into the question as to whether or not the construction of the dams in question has been and will be a recurrent cause of damage to the complainants.

Appellant, while contending that the construction of the dam has not caused damage to appellees' lands, does not argue as seriously and strenuously for a reversal upon the grounds that the proof does not show injury as it does upon its ground of defense set out in paragraph 13 of appellant's answer, the latter part of which alleges: "That if appellant is compelled to lower the crest of said dam or in any other manner lower the level of the water at the point where said dam is located, it will result in an insufficient supply of water to efficiently operate its boilers and condensers, and if it is compelled to remove said dam and allow the water to recede to the bottom of said stream, it will impair the efficiency of said plant seventy-five per cent, and, in the absence of rainfall, within a short time result in shutting down said plant for lack of water supply."

It is further averred in said paragraph that the complainants, during the seven years intervening between the construction of said dam and the filing of the bill, well knew of the work of building said transmission lines and the scope and extent of appellant's operations, and for that period acquiesced in the same, and well knew of the dismantling of said plants in the field in which appellant was operating, one of which was in the City of Taylorville, in and near which the said complainants have at all times resided, and permitted the same to be done without protest upon their part; and appellant avers that the complainants are guilty of laches.

And appellant further answering avers that the benefit which will accrue to the complainants by grant-

ing the mandatory injunction prayed for is slight as compared with the inconvenience and damage which will result not only to the defendant but also the public whom it serves, and as a result thereof the appellees are not entitled to the relief prayed for.

The answer avers and the proof establishes that the appellant has constructed and maintained from 1913 an electrical generating station and dam described in appellees' bill, and that the reproduction cost thereof at this time would be approximately $1,000,000, and that after said generating station and dam were completed the appellant began the construction of high-tension transmission lines leading from said generating station at Kincaid in various directions and included various cities through that portion of the State of Illinois and extending substantially from the eastern line of the State across to the Mississippi river; that all of the main and branch transmission lines mentioned and described exceeding five hundred miles in length have been constructed since said dam was built at an expense of approximately $750,000; that all of the inhabitants of said municipalities and villages are supplied with electrical energy for light, heat and power from said central generating station, and appellant avers the necessity of providing a pool containing a large quantity of water for cooling purposes in the operation of its machinery, and the proofs presented by appellant tend to show that the destruction of this dam will render nugatory the pool and pond for maintaining water for cooling purposes, in which case the operation of said plant, by the requirement of additional coal, additional equipment and further expenses, will add an expenditure in the running of said plant of substantially $275,000 per annum.

It is shown that there is a substation smaller in size at Mattoon, and that occasionally electricity is turned into this system from a plant operated by the Keokuk dam but that generally the cities, towns, vil-

lages, coal mines and other utilities are dependent upon this station for their electrical supply, and appellant urges the comparatively small damage in any event caused to the complainants is not sufficient to warrant a mandatory injunction in this case at the expense of the very large public interest involved.

Appellees offered testimony tending to show that without a dam appellant could establish a pond by digging out the space at a greater depth and fill the same from the extra waters of this river by gravity at an expense of six or seven thousand dollars, and thus supply itself with a pond containing ample waters for cooling purposes, at the additional expense only of pumping the waters to the engines where used.

The complainants furnished proof tending to show that they had no knowledge of the construction of the original dam in 1913 until the same was constructed. The court below found a decree in favor of the complainants and entered a mandatory injunction requiring the appellant to remove said dam within six months from the date of said decree, from which decree appellant has appealed.

Appellant first complains that the bill charged that unless the defendant was compelled to remove the dam or "provide sufficient outlets for the drainage of the water coming from the lands of the complainants, of as ample capacity as existed in a state of nature, irreparable and recurring damage would result to the complainants," and the question raised, and exception taken by appellant, is that the court adopted that alternative of the bill which asked for the removal of the dam, and gave no consideration to the other alternative after the complainants had offered evidence in support of both.

We do not understand that appellees in this case offered any testimony that would establish a reasonable method of removing injury from their lands without the destruction of this dam. Appellees did offer testimony tending to show a plan by which appellant

could exercise its business and operate its machinery without the use of the dams in question. Whether the method was practical or not the lower court may or may not have taken into consideration. Appellees' bill prayed for general relief and under such prayer equity may give every relief consistent with the case made by the bill, and may give relief differently from that specifically prayed for where it is consistent with the facts alleged and proved. *Struve v. Tatge*, 285 Ill. 103; *Atchison, T. & S. F. Ry. Co. v. Stamp*, 290 Ill. 428; *Kelly v. Kelly*, 293 Ill. 169. Certainly, from a careful reading of this record, it would be impossible to determine what relief could be granted complainants other than that granted in the decree.

The main contention in this case made by appellant is that the dam in question was erected in 1913 and the bill was filed in 1920; in the seven years the dam has been maintained, complainant has brought but one suit for damages to his crops; the laches of the complainants in applying for injunctive relief, during which delay the defendant has expended vast sums of money in improvements and extensions, constitutes an equitable bar to the maintenance of the bill.

Appellant insists that the complainants, appellees, do not come into a court of equity with clean hands and quotes the elementary equitable rule that he who seeks equity must do equity: "As a general rule, regulating the action of courts, it is necessarily assumed that different equitable rights have arisen from the same subject-matter or transaction, some in favor of the plaintiff and some of the defendant." Under this rule, "it assumes that the suitor asking the aid of a court of equity has himself not been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence," and Pomeroy states further: "It would never thus interfere on behalf of the plaintiff whose own conduct in connection with the same matter or transaction has been unconscientious or unjust or marked by a want of good faith or had vio-

554    APPELLATE COURTS OF ILLINOIS.

Deterding v. Central Illinois Public Service Co., 231 Ill. App. 542.

lated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain,'' and appellant further presents in connection with this same rule the rule so well stated by Pomeroy: ''By virtue of this principle a specific performance will always be refused when the plaintiff has obtained the agreement by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, by taking undue advantage of his position, or by any other means which. are unconscientious''; and appellant suggests the further equitable doctrine: ''If one maintains silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent.''

In *People v. Union Gas & Electric Co.,* 254 Ill. 395, the court in elaboration of the doctrine of estoppel *in pais,* after quoting a great many cases, said on page 418: ''It appears from the averments of the pleas of estoppel that for ten years the city treated appellant as if it were in the lawful exercise of its franchise, and induced and permitted ' appellant to expend large sums of money in an endeavor to comply with requirements of the municipal authorities, a large part of which would be a total loss if appellant may now be ousted from continuing the exercise of its franchise because permission was not granted it to do so by ordinance.''

It will be noted in this case that the city not only permitted but induced the appellant to expend large sums of money to comply with requirements of the municipal authorities and does not state a case identical with the facts of the case at bar.

In *Whitmore v. Brown,* 102 Me. 47, 9 L. R. A. (N. S.) 868, it was held that equity did not, at the instance of a private citizen, enjoin the maintenance of an unlicensed structure on the seashore as a nuisance after it has been permitted to stand for ten years, and it was

further held that a property owner cannot interfere with the construction of an unlicensed wharf on another's property merely because it will interfere with the enjoyment of his own property and lessen its commercial value.

Appellant urges the further doctrine of equity, so well stated by Pomeroy, vol. 1, Equitable Remedies, sec. 21, as to the doctrine of laches: "Where it would be practically unjust to give a remedy either because the party has, by his conduct, done that which might fairly be regarded as equivalent to a waiver of it, or where, by his conduct and neglect, he has, perhaps, not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him if the remedy were afterward to be asserted, in either of these cases, lapse of time is most material. * * * A court of equity will not interfere to give relief, but will remain passive; and this although the full time may not have elapsed which would be required to bar a remedy at law. If, however, upon the other hand, it clearly appears that lapse of time has not in fact changed the conditions and relative positions of the parties and that they are not materially impaired, and there are peculiar circumstances entitled to consideration as excusing the delay, the court will not deny the appropriate relief, although a strict and unqualified application of the rule of limitations would seem to require it. Every case is governed chiefly by its own circumstances,"—and appellant further insists that where the public derives great benefits from the maintenance and operation of the thing sought to be abated and irreparable injury to complainant is not established beyond all reasonable doubt, or where the defendant's damages and injuries will be much greater by granting the writ than will be the complainant's damages from its refusal, the court, in its sound discretion, will refuse to grant a mandatory injunction. This doctrine is strongly urged upon this court to reverse said decree and as authority appellant cites

556     Appellate Courts of Illinois.

Deterding v. Central Illinois Public Service Co., 231 Ill. App. 542.

Pomeroy's Equitable Remedies, vol. I, sec. 531, in which the rule substantially contended for by appellant is laid down, and very respectable authorities cited for the doctrine, but in the same section the author states: "On the other side, it has been said by an able chancellor on substantially similar facts: 'If it should turn out that the company had no right so to manufacture gas as to damage the plaintiff's market garden, I have come to the conclusion that I cannot enter into any question of however it might be convenient for the public that the gas manufacture should go on. That might be a good ground for the legislature to declare that the company might make gas if they indemnified the plaintiff, but, unless the company had such a right, I think the present is not a case in which this court can go into the question of convenience or inconvenience, and say where a party is substantially damaged, that he can only be compensated by bringing an action *toties quoties*. That would be a disgraceful state of the law and I quite agree with the vice-chancellor, in holding that in such a case this court must issue an injunction, whatever may be the consequences with regard to the lighting of the parishes and district which this company supplies with gas.'" And for authority cited in the note, Pomeroy cites *Village of Dwight v. Hayes,* 150 Ill. 273, 41 Am. St. Rep. 367, aff'g 49 Ill. App. 530.

It was held in *Village of Dwight v. Hayes, supra:* "Where such a nuisance is shown, though causing inconsiderable damage, a court of equity will enjoin its continuance; and in deciding upon the right of a proprietor to an injunction against the creation of such a nuisance, the court will not consider the convenience of the public. The fact that a large population will be affected by the interruption of the use of a system of sewers is immaterial, where the rights of an individual owner are affected."

And it was further held in the *Village of Dwight v. Hayes:* "It is a general rule, formerly strictly en-

forced, that before a court of equity would interfere to restrain a private nuisance, the complainant must establish his right in a court of law. But this rule has been somewhat relaxed in modern times, and when a case is clear, so as to be free from substantial doubt as to the right to relief, and it is evident that a nuisance *per se* is sought to be created, equitable relief will be granted without first resorting to an action at law." The rule laid down in *Village of Dwight v. Hayes* has been followed in *Fletcher v. Town of Lisbon,* 222 Ill. App. 529.

Appellant urges the case of *Lloyd v. Catlin Coal Co.,* 210 Ill. 460. In this case, by covenant and contract rights, one party owned the vein of coal, the other party the surface of the lands. Complainant, fearing that the defendant was going to take out an amount of coal that might cause the subsidence of the surface, sought an injunction. It was a doubtful question as to just what amount of coal could be taken out and leave the surface intact.

The court said (p. 468): "We have carefully examined the evidence and are satisfied with the conclusions of fact reached by the master. In considering this case we must keep in mind the rights of both parties to this litigation. Each has rights that must be recognized and conserved by the courts. Appellant owns the surface, and as a matter of law is entitled to support from the subjacent owner. The right of support is absolute and without condition, not dependent upon the order of the court of chancery by injunction or upon the degree of care that may be used by appellee in the prosecution of its work."

It was held in that case that the great disparity between the value of the coal and the value of the surface made it a case in so much doubt that the court would not grant an injunction, and the court further say as to certain authorities cited by the surface owner (p. 469): "In the cases cited, the relief prayed and granted was in cases where the defendant either

had no right to the strata, or where it was sought to restrain the doing of some specific act, readily susceptible of proof, that would endanger or infringe the complainant's right of support."

Our Supreme Court in *Wente v. Commonwealth Fuel Co.*, 232 Ill. 526, referring to the rule laid down in *Lloyd v. Catlin Coal Co., supra,* says (p. 532): "In the first case the opinion stated that it was uncertain what per cent of the coal could be removed; that it depended upon local conditions as the work progressed; that serious injustice might be done by the court fixing the amount of coal to be left, and that in such a case the rule stated was to be applied. In the second case, where the language was quoted, it was said that the complainant's right to an injunction was not clear but involved in doubt; that the injury alleged to be a consequence of a breach of the contract was remote, problematic and speculative, and, in fact, not at all probable. In such a case it was clearly the duty of the court to consider the consequences of an injunction. In neither case was there any intimation that any such rule of law could be applied where the right is specific and clear, the wrong undoubted and the consequence reasonably certain."

It is to be noted in the second case cited the court say: "That the injury alleged to be a consequence of a breach of the contract was remote, problematic and speculative, and, in fact, not at all probable." Those cases involved a breach of a contract and neither of them involved the case where, as the court say in the last part of the quotation: "In neither case was there any intimation that any such rule of law could be applied where the right is specific and clear, the wrong undoubted and the consequence reasonably certain." And the court further say in *Wente v. Commonwealth Fuel Co., supra* (p. 533):

"The business of the defendant is a necessary one and it is not a nuisance *per se,* but if a business is offensive to such a degree as to materially interfere

with ordinary physical comfort, measured, not by the standard of persons of delicate sensibilities and fastidious habits, but by the habits and feelings of ordinary people, and the damages are of a nature which cannot be adequately compensated for in an action at law, a court of equity will grant an injunction. In such a case the court will not balance public benefits or public inconveniences against the individual right. (*Seacord v. People*, 121 Ill. 623.) The question whether the operation of the hopper was a nuisance might have been determined in an action at law, as was done in the case of *Wylie v. Elwood*, 134 Ill. 281, and that should be done in any case where the legal right and the injury are not clearly established. (*Nelson v. Milligan*, 151 Ill. 462.) But where the legal right of a complainant is clearly established and the unreasonable and unlawful use by the defendant of its property to the injury of the complainant is also clearly proved, it is not necessary that the question should first be determined in a suit at law.''

*Loomis v. Collins*, 272 Ill. 235, is plainly a case involving express covenants between the parties and not a case where the defendant was acting entirely outside of the authority of law, and in *Hill v. Kimball*, 269 Ill. 398, cited by appellant, the case involved a plat of lands and the relative rights of lot owners and dedicator which were covenant and contract rights. And in *City of Pana v. Central Washed Coal Co.*, 260 Ill. 111, it was held (p. 130):

''The existence of a nuisance not having been established by an action at law before bringing this suit in chancery, under all the authorities the facts must be cleary established and the law be without question before an injunction will issue. No such strong or exceptional case of such pressing necessity as would justify the interference of a court of equity exists here.''

In this case the complainants, appellees, have established that the dam in question is a nuisance by an ac-

560    APPELLATE COURTS OF ILLINOIS.

Deterding v. Central Illinois Public Service Co., 231 Ill. App. 542.

tion and judgment at law. Some other cases outside of Illinois have been cited by appellant, but inasmuch as they appear to be not in accord with the law in Illinois, we have not cited such cases.

It has long been the settled rule and doctrine in Illinois that the owners of the dominant heritage have the right to have the water falling upon or coming naturally upon their premises pass off the same upon and over the servient heritage without the flow of such water being obstructed or impeded by the owner of the lower lands. *Peck v. Herrington*, 109 Ill. 611; *Davis v. Highway Com'rs*, 143 Ill. 9; *St. Louis Merchants' Bridge Term. Ry. Ass'n v. Schultz*, 226 Ill. 409-415; *Lambert v. Alcorn*, 144 Ill. 313-326; *Dorman v. Droll*, 215 Ill. 262; *Wills v. Babb*, 123 Ill. App. 511; *Pinkstaff v. Steffy*, 216 Ill. 406; *Winhold v. Finch*, 286 Ill. 614-619.

It has further been the rule and law of this State that the right of drainage through a natural watercourse is an easement appurtenant to the lands from which the superfluous water flows, and there is no easement in favor of the servient estate to change or obstruct the flow of water from the dominant estate. *People v. Chicago & E. I. R. Co.*, 262 Ill. 493-499; *Shontz v. Metzger*, 186 Ill. App. 436-442; *Broadwell Spec. Drain. Dist. v. Lawrence*, 231 Ill. 86; *Kasten v. Brinkman*, 206 Ill. App. 308; *Cache River Drain. Dist. v. Chicago & E. I. R. Co.*, 264 Ill. 97-102; *Gillham v. Madison County R. Co.*, 49 Ill. 484; *Gormley v. Sanford*, 52 Ill. 158.

The bill of complaint alleged and the answer admitted that the appellees were the owners of the dominant heritage; that the river in question was a natural watercourse; that the dams have been constructed without authority of law and that appellee Deterding had recovered a judgment for damages resulting from the obstruction and maintenance of the dam. Furthermore, the court found that all of the appellees had been heretofore and will hereafter be damaged by the

maintenance of the dams, and would suffer irreparable injury therefrom.

When an owner of property is about to be deprived of a legal right in connection with it by the wrongful act of another, the act may be restrained by injunction, or, if already executed, may be required to be undone by the order of the court. *Baumgartner v. Bradt,* 207 Ill. 345; *Hunt v. Sain,* 181 Ill. 372; *Town of Crooked Creek v. King,* 252 Ill. 126; *Town of Bois D'Arc v. Convery,* 255 Ill. 515; *Chicago, B. & Q. Ry. Co. v. People,* 212 Ill. 103; *Windhold v. Finch,* 286 Ill. 614; *Dickerson v. Goodrich,* 190 Ill. App. 505; *Kerber v. Stroh,* 201 Ill. App. 272.

In *Windhold v. Finch, supra,* on pages 618 and 619, the court say: "The evidence of the complainants as to the damage to their land was to the effect that more of their land was overflowed and for a longer time after the embankment was built, in spite of the fact that the exclusion of the water from Sand branch reduced the amount of water coming on the appellees' land, and that the obstruction was the cause of the damage. It is contended by the appellant that the appellees were not entitled to an injunction because there was no evidence of substantial damage to their land. If the evidence of the appellees, alone, is considered it would sustain findings that their land is capable of farming and cultivation and that crops can be and have been raised on it; that by reason of the obstruction of the watercourse a part of the land has been overflowed, even after the diversion of the water from the Sand branch, to a depth of a foot or more, and that such condition continued for a longer time than it would have lasted but for the obstruction; that such condition will be repeated from time to time and will reduce the crops which can be raised on the land, and, if it is permanent, the value of the land. It is true that to justify relief by injunction an actual and substantial injury must be shown, as was held in *Girard v. Lehigh Stone Co.,* 280 Ill. 479, and *Dunn v. You-*

562    Appellate Courts of Illinois.

Deterding v. Central Illinois Public Service Co., 231 Ill. App. 542.

*mans,* 224 Ill. 34, but this does not mean that the injury must necessarily be great in the pecuniary loss involved or impossible of compensation in damages. When an owner of property is about to be deprived of a legal right in connection with it by the wrongful act of another for which there is no legal redress the act may be restrained by injunction, or, if it has already been executed, may be required to be undone, if this is practicable. The irreparable injury necessary to give a court of equity jurisdiction in such a case is not one so great as to be impossible of compensation, but one of such a character that the law cannot give adequate compensation for it. 'The fact that no actual damages can be proved, so that in an action at law the jury could award nominal damages, only, often furnishes the very best reason why a court of equity should interfere in a case where a nuisance is a continuous one.' (Elliott on Roads and Streets 497; *Newell v. Sass,* 142 Ill. 104.) Where an injury is of such constant and frequent occurrence that no fair or reasonable redress can be had for it in a court of law it may be enjoined. *Chicago Gen. Ry. Co. v. Chicago, B. & Q. R. Co.,* 181 Ill. 605.''

It would seem to be the concensus of authority in Illinois that the rule laid down in *Lloyd v. Catlin Coal Co., supra,* involved only cases that were based upon a contract and covenant and where the right was not certain, plain and clear, and that in Illinois, at least, where defendants constitute or establish a nuisance without right or authority of law and not under a contract or a covenant, in cases of irreparable damage the complainants are entitled to an injunction and under the authority of the cases cited the question of the public interest cannot be taken into account or considered. This rule or doctrine is certainly firmly established in this State, and is based upon the constitutional provisions that no person shall be deprived of life, liberty or property without due process of law. The rights contended for by appellant, to overflow the

lands of appellees, cannot ripen into an easement until there has been twenty years' continuous, uninterrupted, adverse and exclusive use, under a claim of right, and no unlawful overflow of lands can ripen into an easement in a less period than twenty years. *Seeger v. Mueller,* 133 Ill. 86; *Lacey v. Lacey,* 199 Ill. App. 208; *Shontz v. Metzger,* 186 Ill. App. 436; *McKenzie v. Elliott,* 134 Ill. 160, and *Landers v. Whitefield,* 154 Ill. 636.

The doctrine of laches has no application to a case of this character. The original dam was built in 1913, and litigation has been pending since the year 1916, and the original dam was largely destroyed by the elements in the year 1920, the later dam being constructed while the present litigation was pending.

The construction of a dam or levee, or other obstruction to the free flow of the water, or the interference with an easement appurtenant to the dominant heritage, is a continuing and also a repeated trespass, and delay in asserting the right for any period less than twenty years is not a bar to the right of appellees to assert their right and have the nuisance abated.

The unlawful obstruction of a stream by dam or embankment, however permanent in character, is never considered in law a permanent structure. And the permanent type or character of the structure can not be availed of as a defense to an action brought by a party whose rights have been invaded to abate the nuisance created by the obstruction to the free flow of the water from the dominant heritage, and nothing that the appellant could do, even the building of a permanent dam (during the progress of the suit) constructed of rock and concrete, could give the dam the character of a lawful permanent obstruction. *Chicago, P. & St. L. Ry. Co. v. Reuter,* 223 Ill. 387; *Canteen Hunting & Fishing Ass'n v. Schwartz,* 128 Ill. App. 224; *Vogler v. Chicago & Carterville Coal Co.,* 180 Ill. App. 51; *Schlitz Brewing Co. v. Compton,* 142 Ill. 515; *Fincher v. Baltimore & O. S. W. R. Co.,*

179 Ill. App. 622; *Ohio & M. R. Ry. Co. v. Thillman*, 143 Ill. 127; *Gaiser v. Chicago, B. & Q. R. Co.*, 161 Ill. App. 90; *Chicago, B. & Q. Ry. Co. v. People*, 212 Ill. 103; *Strange v. Cleveland, C., C. & St. L. Ry. Co.*, 245 Ill. 246; *Strange v. Cleveland, C., C. & St. L. Ry. Co.*, 151 Ill. App. 478.

If the public necessity for the creation of this dam is as great as contended for by appellant, then appellant should proceed to have the property of appellees subjected to this public use, either by contract with the owners or under some form of proceeding that has been declared by the legislature or construed by the courts to be due process of law.

The appellees should not be remitted to the uncertain results of jury trials, already shown in this case to be long drawn out and expensive, in order to obtain a portion of the damages caused them by appellant.

Finding no error in the record the decree of the circuit court of Christian county is affirmed.

*Decree affirmed.*

MR. PRESIDING JUSTICE HEARD dissenting: Complainants should be barred from obtaining relief in a court of chancery by reason of their laches.